STATE *ex rel.* THOMAS (DOUG) KNIGHT

*v.*

THE PUBLIC SERVICE COMMISSION OF W. VA.

E. DANDRIDGE MCDONALD, *etc., et al.*

(No. 14095)

Decided April 7, 1978.

W. Va. Legal Services Plan, Inc., John C. Purbaugh, Leonard B. Knee, for relator.

Ann V. Dornblazer, Arnold O. Weiford, Legal Division, Public Service Com., for respondents.

Richard S. Weygandt, Jackson, Kelly, Holt & O'Farrell, F. Paul Chambers, Michael A. Albert and W. Henry Jernigan, Jr., for intervenor Monongahela Power Co.

Steptoe & Johnson, Willis O. Shay, for The Cabot Corp., et al., amicus curiae.

Thomas N. Hann, for W. Va. Small Public Utilities Ass'n, amicus curiae.

NEELY, JUSTICE:

This action in prohibition challenges the constitutionality of W.Va. Code, 24-2-4 [1974][1] which authorizes a

[1] W.Va. Code, 24-2-4 [1974] states:

No public utility subject to this chapter shall change, suspend or annul any rate, joint rate, charge, rental or classification except after thirty days' notice to the commission and the public, which notice shall plainly state the changes proposed to be made in the schedule then in force and the time when the changed rates or charges shall go into effect; but the commission may enter an order suspending the proposed rate as hereinafter provided. The proposed changes shall be shown by printing new schedules, or shall be plainly indicated upon the schedules in force at the time, and kept open to public inspection: Provided, that the commission may, in its discretion, and for good cause shown, allow changes upon less time than the notice herein specified, or may modify the requirements of this section in respect to publishing, posting and filing of tariffs, either by particular instructions or by general order.

Whenever there shall be filed with the commission any schedule stating a change in the rates or charges, or joint rates or charges,

public utility to charge rate increases before a final determination of the legitimacy of those increases by the Public Service Commission. This action arises in prohibition but we are not quite certain what it is that the relator would have us prohibit, as the statutory scheme in West

---

or stating a new individual or joint rate or charge or joint classification or any new individual or joint regulation or practice affecting any rate or charge, the commission shall have authority, either upon complaint or upon its own initiative without complaint, to enter upon a hearing concerning the propriety of such rate, charge, classification, regulation or practice; and, if the commission so orders, it may proceed without answer or other form of pleading by the interested parties, but upon reasonable notice, and, pending such hearing and the decision thereon, the commission, upon filing with such schedule and delivering to the public utility affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, regulation or practice, but not for a longer period than one hundred and twenty days beyond the time when such rate, charge, classification, regulation or practice would otherwise go into effect; and, after full hearing, whether completed before or after the rate, charge, classification, regulation or practice goes into effect, the commision may make such order in reference to such rate, charge, classification, regulation or practice as would be proper in a proceeding initiated after the rate, charge, classification, regulation or practice had become effective: Provided, however, that if any such hearing and decision thereon cannot be concluded within the period of suspension, as above stated, such rate, charge, classification, regulation or practice shall go into effect at the end of such period. In such case the commission may require such public utility to enter into a bond in an amount deemed by the commission to be reasonable and conditioned for the refund to the persons or parties entitled thereto of the amount of the excess, plus interest at the rate of not less than six nor more than ten percent per annum as specified by the commission, if such rates so put into effect are subsequently determined to be higher than those finally fixed for such utility. In specifying the applicable interest rate between the aforesaid minimum and maximum, the commission shall be guided by the interest rate which such public utility would in all probability have to agree to pay if such public utility at that time borrowed in the marketplace a sum of money equivalent to the amount of money the commission estimates the increase in rates will produce between the effective date of such increase and the anticipated date the rates will be finally fixed for such public utility, it being intended that a public utility should be discouraged from imposing higher rates than it should reasonably anticipate will be finally fixed as a means in effect of borrowing

Virginia permits proposed rate increases to go into effect after one hundred and fifty days *absent* any action by the Public Service Commission. We shall assume *arguendo*, however, for the purposes of this case, that if the challenged statute were unconstitutional some exercise in judicial imagination would permit us to reach the issue on prohibition. As hundreds of man-hours have been devoted to the presentation of this case by counsel, and as the issue is one of substantial public concern, we shall dispose of the case on the merits. The Court has thoroughly researched and maturely considered all of the constitutional issues raised in the proceeding, and as we find that West Virginia's statutory scheme, which permits a utility to impose rate increases under bond, is constitutional, we deny relief.

This case arises from rate increases for electric utility service proposed by Monongahela Power Company on November 30, 1976. The Public Service Commission exercised its regulatory power on December 8, 1976 by suspending the increase for the statutory maximum of one

money at a rate of interest less than such public utility would have to agree to pay if it borrowed money in the marketplace. No such accrued interest paid on any such refund shall be deemed part of the cost of doing business in a subsequent application for changing rates or any decision thereon. At any hearing involving a rate sought to be increased or involving the change of any fare, charge, classification, regulation or practice, the burden of proof to show that the increased rate or proposed increased rate, or the proposed change of fare, charge, classification, regulation or practice is just and reasonable shall be upon the public utility making application for such change. When in any case pending before the commission all evidence shall have been taken, and the hearing completed, the commission shall, within three months, render a decision in such case.

"Where more than twenty members of the public are affected by a proposed change in rates, it shall be a sufficient notice to the public within the meaning of this section if such notice is published as a Class II legal advertisement in compliance with the provision of article three [§ 59-3-1 et seq.], chapter fifty-nine of this Code and the publication area for such publication shall be the community where the majority of the resident members of the public affected by such change reside or, in the case of nonresidents, have their principal place of business within this State.

hundred and twenty days, after the initial statutory, non-discretionary thirty day notice period. The Public Service Commission failed to conclude hearings and determine the reasonableness of the increases for which Monongahela petitioned in the hundred and fifty day period, and at the end of that period the commission ordered the posting of a bond before the utility-proposed rates automatically went into effect pursuant to *W.Va. Code*, 24-2-4 [1974]. Hearings on the reasonableness of Monongahela Power's rate increases began on December 5, 1977 and the case is still in the breast of the Public Service Commission.

The relator, Thomas Knight, contends that the imposition of the proposed higher rates before the commission's determination of the reasonableness of those rates is unconstitutional, and asks that this Court direct that *W.Va. Code*, 24-2-4 [1974] be applied to require the Commission to hold a hearing before the imposition of rates under bond. Mr. Knight is a resident of Lost Creek, Harrison County, West Virginia. He is married, has two minor children, and lives on a gross income of $600 per month. He is a customer of Monongahela Power Company and alleges that any increase in the amount that he is required to pay for electricity upsets the careful balance of his finances and that, even with interest, the eventual refund with interest which may later be payable to him after determination of just and reasonable rates does not alleviate the financial problems he has now because his current financial needs are urgent.

On January 30, 1975, before filing the rate increase at issue here, Monongahela moved to increase rates and charges for electrical service in the territory served by it in West Virginia by filing revised tariffs with the Commission in the approximate amount of 30.9 million dollars annually. The Commission deferred implementation of those rates pursuant to *W.Va. Code*, 24-2-4 [1974] until June 28, 1975, and required Monongahela to post a bond to secure ratepayers their eventual refunds if the Commission found that the increases were not justified. On June 28, 1975, however, the new rates went into effect and

Mr. Knight was required to pay them. Before the conclusion of this first case, Monongahela, as noted above, filed a second tariff on November 30, 1976 to increase rates which is now the subject of this law suit. This second rate increase went into effect on April 28, 1977 and is still in effect under bond.

On March 18, 1977, in the prior case which had begun on January 30, 1975, the Commission decided to allow an annual rate increase of $9,037,286 and required a refund of all excess rates charged. Monongahela Power then requested a rehearing and reargument of the case from the Public Service Commission which was denied; Monongahela appealed to the West Virginia Supreme Court of Appeals, which refused to docket the appeal; and, finally Monongahela sought relief from various federal courts, none of which granted the relief. In August, 1977, after thirteen months of charging rates, 71% of which were finally denied, Monongahela began paying the refund and the relator, Mr. Knight, probably with substantial justification, felt himself sorely abused.[2]

The relator attempts to bring his issues within the scope of the writ of prohibition by asserting that the Commission exercises its authority to determine the rates charged consumers, and in the case before us has already entered an order setting bond as a condition precedent to the increased rates going into effect, all in the exercise of its *quasi*-judicial power over the rate-making process. The relator alleges that the Commission, by following a statutory scheme which violates the relator's constitutional rights, is exceeding its lawful power, and a writ of prohibition will lie to prevent this violation. We find the argument original; however, it

---

[2] Mr. Knight's sense of outrage at the power of monopolies is certainly not new; the problem has been with us throughout the history of Anglo-American law. For example, Sir Nicholas Bacon, Lord Keeper of the Great Seal, once responded to Queen Elizabeth when queried about monopolies, "Madam, will you have me speak the truth? *Licentiâ omnes deteriores sumus.*" John Lord Campbell, *Lives of the Lord Chancellors and Keepers of the Great Seal*, (London: 1868) Vol. II, p. 278.

does fly in the face of syl. pt. 2 in *Randall Gas Company v. Star Glass Co.*, 78 W. Va. 252, 88 S.E. 840 (1916) which states:

> The power of the Commission to alter rates, charges and tolls for public service, is delegated legislative power, and the procedure in the exercise thereof is also legislative in character.

While old West Virginia cases should not, in and of themselves, unduly terrorize modern litigants with contemporary problems unforeseen by our predecessors, nonetheless this particular quoted syllabus point seems to state accurately the overwhelming weight of modern-day authority as well. *See, e.g.*, the recent case from the parent commonwealth, *Commonwealth of Virginia v. Portsmouth Gas Company.*, 213 Va. 239, 191 S.E.2d 220 (1972) as well as the numerous authorities cited in 64 Am. Jur.2d *Public Utilities* § 89, 73 C.J.S. *Public Utilities* § 16, and 16 C.J.S. *Constitutional Law* § 198. While the Commission does have adjudicatory, *i.e.*, *quasi*-judicial functions, rate-making is not one of them. We shall not dally with procedure, however, since if the Commission's actions were unconstitutional the question could be reached somehow.

## I

The relator asserts that there is a common law right in the consumer to just and reasonable rates from a governmental created monopoly. For this proposition he cites *Allnutt v. Inglis*, 12 East, 526, 104 English Reports 206 (1810) as well as Hargrave, *Collection of Tracts Relative to the Law of England*, Vol. I, c. 2, (Dublin: 1787). Certainly the law of monopoly in England had a tumultuous history until the issue was tentatively settled by the statute of 21 James I c. 3 [1623] which codified an informal composition between the Sovereign and Parliament in the forty-third year of Elizabeth's reign (1601), when the Crown agreed not to issue monopoly patents in the future except for what we would call today "public purposes."

During the reign of the last Tudor, the Stuarts, and the Hanovers, when the mercantilist philosophy (as opposed to the laissez-faire philosophy) was at its height, the notion of what constituted a "public purpose" included far more subjects than the law of this Country would have embraced in the 19th Century, when our courts were grafting Adam Smith's *Wealth of Nations* onto the concept of "property" in the due process clauses of federal and state constitutions. Nonetheless, we should not permit the political and economic battles of the 17th and 18th Centuries, in which all monopolies were justly reviled in theory, but broadly supported in practice, to cause us to lose sight of the fact that during the same time there were legitimate monopolies, even by 19th Century American law standards, such as ferries, and that certain rules applied to them.

It appears that in order for the common law right to reasonable rates to arise. the monopoly had to come into existence pursuant to a statute, as in *Allnutt, supra,* or pursuant to a royal grant to perform a service or to supply a commodity, touched with a public purpose, as discussed in Hargrave, *supra.* We would frankly confess, however, that ancient law is confused in this regard because of the uncertainty in the 17th Century concerning the extent of the King's prerogatives in these matters, notwithstanding 21 James I c. 3.

The respondent argues that the uniform authority in this Country is that at common law, a public utility, like the seller of any unregulated commodity, had the right to change its rates at will. *United Gas Pipeline Co. v. Memphis Light, Gas & Water Division,* 358 U.S. 103 (1958); *F.P.C. v. Hunt,* 376 U.S. 515 (1964). That is not a correct statement of the law of this State to the extent that rate charges may be unreasonable and thus conflict with the consumer's common law right to reasonable rates for services or commodities provided by any regulated industry. In this regard it is important to distinguish between a monopoly created by government regulation, and a natural monopoly arising through the vagaries of a particular local economy. When Elizabeth

agreed with her Parliament voluntarily to desist from defending her prerogative to issue monopoly patents at will, the Speaker's account of Elizabeth's message to Parliament [D'ewes 652] summarizes her concession as 'that further order should be taken presently and not *in futuro* . . . and that some [monopolies] should be presently repealed, some suspended, and none put in execution, but such as should first have a tryal according to the law for the good of the people." Indeed the common law judges were making inroads in the regulation of monopoly, and it appears that as early as 1577 the Judges of Queen's Bench and Common Pleas had been releasing those imprisoned for infringing the monopoly of the Spanish Company, which actions on the part of the common law judges had called forth an Order in Council to desist from such interference. *See,* Holdsworth, *A History of English Law,* Vol. IV, p. 348, n. 5. (London: 1973).

The statute of 21 James, c. 3 [1623], *supra,* declares the universal abhorrence of English subjects to every form of monopoly; nonetheless, it also provides numerous instances in which the royal prerogative may still be exercised to charter monopolies and implies that some reasonable regulation of them is expected. It is this reasonable regulation to which the *Allnutt* case, *supra* speaks in 1810,[3] and we can see no distinction in West

---

[3] The plaintiff in the *Allnutt* case attempted to store imported wine without payment of duty in the defendant's bonded London warehouse, which had been established for that purpose pursuant to stat. 39 & 40 Geo. 3, c. 47, stat. 43 Geo. 3, c. 132, and stat. 44 Geo. 3, c. 100. The defendant Inglis, Treasurer of the London Dock Company, rejected the plaintiff's goods, although by his plea in the case he admitted "that the hire and reward offered by the plaintiffs to the [dock] company for warehousing the goods was reasonable . . ." *Allnutt v. Inglis,* 12 East 527 at 529. The basis for the defense was that the amount offered by the plaintiff for storage of the goods, while admittedly reasonable, was less than that required by the company in its published schedule of rates. The plaintiff refused to pay the published rate and insisted on paying only a reasonable amount. It was held that, as the dock company had a monopoly privilege for bonded storage of wines, it was bound by law to take only reasonable rates for the use of its warehouses for that purpose. Furthermore, it does not appear that the compelled

Virginia between the monopolies legitimately created by the Crown in England and a public utility, the monopoly for which is granted by general law in ch. 24 of the *W. Va. Code.* We agree, therefore, with relator that in this State, where "such parts of the common law ... of this State as are in force on the effective date of this article and are not repugnant thereto, shall be and continue the law of this State until altered or repealed by the Legislature," *W. Va. Const.*, Art VIII, § 13, (*see also, W.Va. Const.*, Art. VIII, § 21, repealed 1974) there is a common law right to reasonable rates from any monopoly created by the State, and this right, having existed before the adoption of our constitution, would be encompassed within the concept of property protected by *W.Va. Const.*, Art. 3, § 10.[4]

---

acceptance of reasonable rates was justified solely on the basis of the company's monopoly privilege, since the opinion indicates that the case would not have been decided differently if the exclusive privilege had been extended to others in competition with the London Dock Company. Rather, a broader principle seems to have been established that where a business is affected with a public interest, its property ceases to be *juris privati* only and the rates for the use of the property are subject to regulation to insure their reasonableness.

[4] While the *Allnutt* case gives a thorough and thoughtful statement relating to the common law requirements of reasonable rates in certain situations the principles it enunciates are firmly rooted in earlier precedent. One of the oldest examples of the imposition of common law reasonable rate requirements is in connection with the operation of ferries. *See Paine v. Partrich,* Carthew 191 (c. 1692) and Vol. V Pt. I *Comyns's Digest,* Piscary (1822). Another common area in which only reasonable tolls could be exacted, from time out of mind, is milling. *See* the following English cases. *Gard v. Callard,* 6 M. & S. 70 (1817); *Cort v. Birkbeck,* 1 Dougl. 218 (1779); *Drake v. Wiglesworth,* Willes 654 (1752). Likewise is the situation of the use of cranes in a public wharf. *See Bolt v. Stennet,* 8 T.R. 606 (1800).

These legal principles came into West Virginia jurisprudence indirectly through the Virginia common law as it had developed up until the formation of West Virginia in 1863. By an ordinance of the Virginia convention all of English common law was incorporated in Virginia in 1776, together with those acts of Parliament of a general nature made in aid of the English common law before the fourth year of James the First [1607]. Later, in 1792, the incorporation of the common law remains in force and effect in Virginia to the extent it has not been modified by legislative action and is not

## II

Since it has been determined that consumers have a subsisting property interest in reasonable rates on the part of government created monopolies, which would put into operation certain due process protections, the question is now presented of what process is mandated. The relator challenges *W.Va. Code* 24-2-4 [1974] on both substantive and procedural due process grounds. As we have held that relator's interest in just and reasonable rates existed at common law to the extent that it is subsumed in the constitutional notion of property, we distinguish the case at bar from *Arnett v. Kennedy*, 416 U.S. 134 (1974) which holds that where there is a government created interest, the interest itself is conditioned by the procedural limitations which accompanied the grant of that interest. Accordingly, the limitations of the statute, *per*

---

repugnant to the nature and character of Virginia's institutions or the different and varied circumstances of the new state. *See Cunningham v. Dorsey*, 3 W.Va. 293 (1869). Even English common law developed after 1776 is regarded as persuasive in Virginia in some instances. *See Virginia Code*, § 1-10 (1919).

Our link with Virginia common law, and thus indirectly with English common law, was provided by the original West Virginia Constitution, which stated that

"[S]uch parts of the common law and the laws of the State of Virginia as are in force within the boundaries of the State of West Virginia, when this constitution goes into operation, and not repugnant thereto, shall be and continue the law of this state until altered or repealed by the legislature." [*W.Va.Const.*, art. II, § 8 (1863)]

For the most recent version of this constitutional provision, *see W.Va. Const.*, art VIII, § 13, cited in the text.

It does not appear that Virginia changed the common law entitlement to reasonable rates in the period from 1776 to 1863; therefore, by virtue of our constitutional provisions relating to the incorporation of Virginia common law, we received the English common law principles from Virginia into our own jurisprudence. We note that Virginia in many instances granted the right to reasonable rates expressly by statute, rather than by common law. In this respect the Virginia statutes are declaratory of the common law and do not supplant or alter it in areas the statutes do not reach. *See The Tuckahoe Canal Company v. The Tuckahoe and James River Rail Road Company*, 11 Leigh 42 (1840); *Noah Zane v. Jonathan Zane*, 2 Va. Cas. 62 (1816).

*se,* are not the subject of our inquiry, but rather the legitimacy of the entire scheme.

The historical precedents, while interesting, do not make relator's case because at common law there was always some question concerning how the public's right to just and reasonable rates should be enforced. In England where the King in Parliament was Sovereign (at least, according to that great defender of individual freedom and ancient rights, Lord Coke), there was no question that Parliament could choose any scheme for regulating monopolies which it desired. Maitland, *The Constitutional History of England,* p. 301, (London: reprint 1974). In fact, as the statute of 21 James I c. 3 [1623] perfectly well indicates, Parliament could permit inventors to enjoy a government created monopoly privilege for a set term of years without any regard to the reasonableness of the rates they charged for their product. Certainly *W.Va. Code,* 24-2-4 [1974] provides a method of regulating public utility rates, and this Court cannot say that it does not "bear a reasonable relationship to a proper legislative purpose." *State ex rel. Harris v. Calendine,* W. Va., 233 S.E.2d 318 (1977). It is, therefore, constitutional under the substantive due process concepts inherent in *W.Va. Const.,* Art. III, § 10.

The Court believes that *W.Va. Code,* 24-2-4 [1974], which is patterned after § 15(7) of the Interstate Commerce Act, 49 USC § 15(7) represents a careful legislative balancing of interests.[5] *State ex rel. Public Service Commission v. Baltimore & Ohio Railroad,* 76 W.Va. 399 at 405–406, 85 S.E. 714 at 717 (1915). The legislative histories of both statutes are identical, and show the legislative efforts to find the proper balance between consumer and investor interests.

---

[5] Since *W.Va. Code,* 24-2-4 [1974] has a legislative history paralleling §15(7) of the Interstate Commerce Act, federal decisions interpreting that federal provision are persuasive in reviewing the State statute. *State v. Williams,* 563 P.2d 1270, 1271 (Wash. 1977). *General Communications Engineering v. Motorola Communications and Electronics,* 421 F. Supp. 274, 294 (N.D. Cal. 1976).

Those histories show:

1) The original West Virginia Public Service Law and Interstate Commerce Act permitted a utility to increase its rates after a notice period without any power in the Commission or the ICC, respectively, to protect consumers against unreasonable rate increases pending investigation of the new rates.

2) After "a protracted controversy" this balance in favor of protecting utility investors against "loss of revenue ... fairly due them if the rates were finally determined to be lawful" was shifted to protect utility consumers who "might for a time have to pay unlawful rates because a proceeding might not be concluded." *Arrow Transportation Co. v. Southern Railway Co.*, 372 U.S. 658, 664–666 (1963).

3) This new balance was accomplished by giving both the Commission and the ICC authority to suspend rate increases for a maximum period of 300 days.

4) Subsequently, the legislature and Congress determined that a 300 day suspension period tipped the scales too much in favor of the utility consumers by subjecting the utility to unreasonably long periods of inadequate earnings which, in turn, jeopardized the continued availability of adequate service.

5) Finally, the maximum suspension periods were reduced under both statutes. However, to provide additional protection to consumers, the legislature and Congress authorized the Commission and the ICC to require refunds with interest of the rate increases collected by the utility after the expiration of the suspension period where interim rates were higher than the rates subsequently approved.

After this extensive "experimentation with the period of suspension," *Interstate Commerce Commission v. Inland Waterways Corp.*, 319 U.S. 671, 689 (1943), the West Virginia Legislature repeatedly rebuffed attempts to alter

the existing balance of consumer and investor interests.[6]

The United States Supreme Court, in reviewing challenges to the suspension provision of the Interstate Commerce Act,[7] has held that this provision rationally relates to a constitutionally proper accommodation of competing interests. *U.S. v. SCRAP*, 412 U.S. 669, 697 (1973); *Arrow Transportation Co. v. Southern Railway Co.*, 372 U.S. 658, 664–667 (1963). In the *SCRAP* case, the Court observed that this rate-regulation provision:

---

[6] Legislation has been introduced in the West Virginia Legislature since at least 1973 to increase the period of time for which the Commission could suspend utility-initiated rates. Eight bills would have prohibited utility-initiated rates from becoming effective prior to Commission approval, thereby permitting the Commission to suspend these rates indefinitely. The maximum suspension period would have been increased from 120 days to 180 days by 2 bills and to 150 days by 2 other bills. None of these bills was passed by the Legislature.

The following table summarizes these bills:

| Legislative Session | Bill Numbers | Proposed Suspension Period |
|---|---|---|
| 1973 | H.B.1151 | 180 days |
| 1976 | H.B.946 | indefinite |
| | H.B.996 | indefinite |
| | H.B.1123 | indefinite |
| | H.B.1519 | indefinite |
| 1977 | H.B.925 | indefinite |
| | H.B.945 | indefinite |
| | H.B.1023 | indefinite |
| | H.B.1328 | indefinite |
| | H.B.1506 | 180 days |
| | H.B.1696 | 180 days |
| | H.B.620 | 150 days |

[7] This code section also parallels every federal and most state rate-regulation statutes. *See, e.g.*, Communications Act of 1934, 47 U.S.C. §204; Federal Aviation Act of 1958, 49 U.S.C. §1482(g); Federal Power Act, 16 U.S.C. §824d; Freight Forwarders Act, 49 U.S.C. §1006(e); Intercoastal Shipping Act of 1933, 46 U.S.C. §845; Motor Carrier Act, 49 U.S.C. §§316(g), 318(c); Natural Gas Act, 15 U.S.C. §717c(e); Water Carrier Act, 49 U.S.C. §907(g)(i). For state statutes, *see*, National Association of Regulatory Utility Commissioners, *1976 Annual Report On Utility and Carrier Regulation* 395-396 (1977).

> ... represents a careful accommodation of the
> various interests involved. The suspension period
> was limited as to time to prevent excessive harm
> to the carriers, for the revenues lost during that
> period could not be recouped from the shippers.
> On the other hand, Congress was aware that if
> the Commission did not act within the suspen-
> sion period, then the new rates would automati-
> cally go into effect and the shippers would have
> to pay increased rates that might eventually be
> found unlawful. To mitigate this loss, Congress
> authorized the Commission to require the carri-
> ers to keep detailed accounts and eventually to
> repay the increased rates found unlawful.
> [412 U.S. at 697].

Moreover, federal and state courts confronted with
consumer claims of unconstitutionality have consistent-
ly upheld state laws paralleling West Virginia's maxi-
mum suspension provision as striking a proper balance
of the competing interests of utility consumers and utili-
ty investors. *See, e.g. Senior Citizens Clubs of Winston-
Salem v. Duke Power Co.*, 425 F. Supp. 411 (W.D.N.C.
1976); *Georgia Power Projet v. Georgia Power Company*,
409 F. Supp. 332 (N.D. Ga. 1975); *Holt v. Yonce,* 370 F.
Supp. 374, 379 (D.S.C. 1973), *aff'd,* 415 U.S. 969 (1974);
*Sellers v. Iowa Power and Light Co.*, 372 F. Supp. 1169
(S.D. Iowa 1974); *Baker v. Pennsylvania Public Utility
Commission,* 322 A.2d 735, 737 (Pa. Cmwlth. 1974).

These federal and state statutes, which permit a utili-
ty to collect its new rates subject to refund with interest
after expiration of the suspension period, provide sub-
stantial benefits to utility consumers, as well as utility
investors. As the courts have admonished, preventing
the utility from collecting rate increases subject to re-
fund with interest can cause the utility to suffer "irrepa-
rable loss" and may prevent the utility from providing
"adequate service during a period of rising costs." *Amer-
ican Telephone and Telegraph Co. v. FCC,* 487 F.2d 865,
874 (2nd Cir. 1973).

West Virginia public utilities law, like its federal and
state counterparts, recognizes "[b]usiness reality de-

mands" that a utility be permitted by law to increase its rates "whenever that is the economically necessary means" of balancing revenues and procuring "the vast sums necessary for the maintenance and expansion" of utility service to customers. *United Gas Pipeline Co. v. Memphis Gas Division*, 358 U.S. 103 at 113 (1958). We find particularly persuasive the respondent's argument that any scheme which unreasonably delays a utility's ability to implement new rates has the tendency of redistributing the cost of utility service from current utility users to future utility users.

We decry what can only appear to any reasonable person as an unmitigated abuse of the legal structure by utilities in demanding unreasonable rates at the outset and then litigating interminably about hopeless issues; nonetheless, the determination of rates for major utilities is a lengthy process and any deficit occasioned by a utility's inability to charge a fair rate at any given time under *W.Va. Const.*, Art. 3, § 10 must be made up in the rate structure sometime in the future. Since today's customers are not necessarily tomorrow's customers, we cannot conclude that the Legislature has been irrational in designing a rate changing procedure which forecloses the possibility of passing today's costs onto tomorrow's customers.

Furthermore, while relator's suit challenges the rate structure of a major, well-capitalized, public utility, there are hundreds of small utilities which must also be regulated by the same general law. These small utilities frequently experience acute cash-flow problems, and under any other scheme of regulation their long-term well-being might be seriously threatened. For example, a small gas utility which must purchase its gas from a larger supplier needs immediate rate relief in order for it to meet its current liabilities when its raw materials' cost increase. Although the costs of raising money in the capital market in terms of lawyers' fees, registration statements, and other expenses may be insignificant in proportion to the amount of money raised by the telephone company, the major electric companies, or the

major gas companies, these costs are proportionately enormous for small companies because administrative costs do not necessarily vary to any significant extent with the amount of money which the utility seeks to raise.

### III

Finally we must address petitioner's challenge to *W. Va. Code*, 24-2-4 [1974] from the perspective of procedural due process. As this Court has held in syl. pt. 2 of *North v. Board of Regents*, W.Va., 233 S.E.2d 411 (1977):

> First, the more valuable the right sought to be deprived, the more safeguards will be interposed. Second, due process must generally be given before the deprivation occurs unless a compelling public policy dictates otherwise. Third, a temporary deprivation of rights may not require as large a measure of procedural due process protection as a permanent deprivation.

We find that the rate-making procedure designed by the Legislature in *W. Va. Code*, 24-2-4 [1974] is in consonance with the functional criteria articulated in *North*. The relator makes a persuasive case that a deprivation of money today places him in a precarious financial position and that a refund with interest sometime in the distant future does not make him whole for the inconvenience which he faces today; nonetheless, we cannot say that the deprivation of a small sum of money, even in relation to relator's allegedly meager income, constitutes deprivation of the same magnitude as the seizure of the family cooking stove, *Fuentes v. Shevin*, 407 U.S. 67 (1972), or as a restraint of personal liberty, *Smoot v. Dingess*, W. Va., 236 S.E.2d 468 (1977), or even as the expulsion from a professional school, *North, supra*. Furthermore, as we discussed above, there is a compelling public policy which militates in favor of denying relator his money before the Public Service Commission concludes all of its hearings because, while the rule may appear to be harsh, any other rule may have even more adverse effects upon all consumers as a class. Finally,

relator admits that his deprivation is only temporary, and is mitigated to an extent by the requirement that interest be paid on the refund of that portion of the rate increase later found to be unreasonable.

The Legislature could have chosen any one of numerous procedures to assure the consumer that public utilities charge just and reasonable rates. We find that in light of the interests involved, the competing public policies militating in favor of different approaches to the problem, and the need to balance conflicting yet legitimate interests, the procedures chosen by the Legislature comport with this society's notion of fundamental fairness and pass scrutiny under the due process clause of *W.Va. Const.*, Art. 3, § 10 and its federal equivalent.

For the reasons set forth above, the writ of prohibition for which the relator prays is denied. My brother, Mr. Justice McGraw, dissents and would award relief.

*Writ denied.*

McGRAW, JUSTICE, *dissenting:*

I respectfully dissent from the Court's holding that the expulsion of a student from medical school is of greater deprivation than the one Mr. Knight has suffered. This kind of economic elitism shows a calloused indifference and disregard for the economic pressures that beset ordinary people as a result of the systematic imposition, under bond, of unreasonable utility rate requests.

This Court now indicates that the Constitution will not allow the taking of the family cook stove but will allow the taking of the money needed to pay for the stove or the energy needed to operate it.

I would hold that the Due Process Clause, Article 3, § 10 of the *W.Va.* Constitution, protects a consumer from utility rate increases placed into effect prior to a hearing on whether the increase is reasonable, fair and just.

MILLER, JUSTICE, *concurring:*

While I concur in the result in this case, I differ to some extent on the method used to reach it.

I have no quarrel with the majority's position that W. Va. Code, 24-2-4, does not violate constitutional requirements of substantive due process. This section relates purely to procedural aspects of administrative determination of rates by the Public Service Commission. The general power to regulate public utilities is covered in W.Va. Code, 24-2-2, -3, and we are cited no case holding that legislative enactments regulating public utilities violate constitutional substantive due process concepts.

We recognized in *State ex rel. Harris v. Calendine*, W. Va., 233 S.E.2d 318, 324 (1977), that the principle of *substantive* due process is contained in Article III, Section 10 of the West Virginia Constitution.

I would make the same distinction as the United States Supreme Court in cases where a substantive due process attack has been made on legislative acts which primarily deal with economic matters, that the Court should rarely intervene unless the Legislature has acted in a wholly arbitrary and irrational way. *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 49 L. Ed. 2d 752, 96 S.Ct. 2882 (1976); *Ferguson v. Skrupa*, 372 U.S. 726, 10 L. Ed. 2d 93, 83 S.Ct. 1028 (1963). On the other hand, where sensitive and fundamental rights are directly circumscribed by legislation, the substantive due process scrutiny will be more penetrating. *See Moore v. City of East Cleveland*, 431 U.S. 494, 52 L. Ed. 2d 531, 97 S.Ct. 1932 (1977), and cases cited therein.

Tested by this standard, the involved statutes granting regulatory powers to the Public Service Commission do not violate substantive due process. The legislative purpose of the statutes is primarily economic and they evidence a reasonable attempt to balance the competing economic interests of the affected parties.

The crux of relator's complaint is the lack of adequate *procedural* due process protection in permitting the pre-

liminary rate to go into effect under bond as required by W. Va. Code, 24-2-4. The majority's conclusion that a rate payer has a property interest arising out of an entitlement to just and reasonable rates is undoubtedly correct, although I am not certain the common law makes it so. *Interstate Commerce Commission v. B & O Railroad*, 145 U.S. 263, 36 L. Ed. 699, 12 S.Ct. 844 (1892). Certainly, there is a statutory entitlement under Code 24-2-3, and this suffices under *Waite v. Civil Service Commission*, W.Va. 241 S.E.2d 164 (1977); *see Memphis Light, Gas & Water Div. v. Craft*, No. 76-39, U.S., L. Ed. 2d, S. Ct. (May 1, 1978).

I would have preferred that the Court follow the procedural due process analysis set out in *Waite*. There we held that only when a protected property interest is found must we begin an inquiry as to the measure of procedural due process required. Such inquiry proceeds according to the three standards as set out in the Fifth Syllabus of *Waite*:

> "The extent of due process protection affordable for a property interest requires consideration of three distinct factors: first, the private interests that will be affected by the official action; second, the risk of an erroneous deprivation of a property interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

Considering the first of the three factors, the private interests that will be affected, it is clear that during the period that preliminary tariff is in under bond, and assuming there will be a final reduction in the tariff by the Public Service Commission, the rate payer will pay a higher rate than the final tariff rate. However, it is equally clear that he will be entitled to repayment with interest for the amount of the tariff denied. It has been recognized that the length of deprivation is a matter to

be considered in assessing the effect of the deprivation on the private interest. *Fusari v. Steinberg*, 419 U.S. 379, 389, 42 L. Ed. 2d 521, 529, 95 S.Ct. 533 (1975); *North v. Board of Regents*, W. Va., 233 S.E.2d 411 (1977).

Of importance in this stage of the analysis is that the return of the property is automatic and does not require the rate payer to expend time or funds to regain it. Furthermore, the statutory scheme weighs against the utility by providing that the interest repaid on refunds cannot be charged in the future as part of the cost of doing business. W.Va. Code, 24-2-4. Cast in its most favorable light, the private interest harmed is the temporary deprivation of a sum of money that ultimately will be returned with interest.

The second factor, the risk of erroneous deprivation under the present statutory scheme, presents several considerations. First, the statute permits any interested person to intervene in the administrative rate filing procedure. Obviously this means any rate payer has standing to object to a rate filing. *Wingrove v. Public Service Commission*, 74 W. Va. 190, 81 S.E. 734 (1914); *Delardas v. Morgantown Water Commission*, 148 W. Va. 776, 137 S.E.2d 426 (1964).

The right to place a new tariff rate into effect becomes absolute if the Commission has not acted within the 120-day suspension period. W.Va. Code, 24-2-4. To this extent, the possibility of an erroneous deprivation is not entirely hypothetical. Balanced against this possibility is the fact that an erroneous deprivation may not be ultimately found, and if found, the overcharge will be refunded with interest. No doubt there is a risk of erroneous deprivation over the short term. However, this deprivation is mitigated to the extent that the amount involved is normally not large for the individual, and is to be distinguishable from those situations where the benefit deprived may constitute all or substantially all of an individual's income. *Goldberg v. Kelly*, 397 U.S. 254, 25 L. Ed. 2d 287, 90 S.Ct. 1011 (1970).

We are not furnished with sufficient factual information as to the amount or frequency of refund by public utilities in this State which would reflect the risk degree of erroneous deprivation. *See Mathews v. Eldridge*, 424 U.S. 319 at 346, n. 29, 47 L. Ed. 2d 18, 96 S.Ct. 893 (1976).

Finally, consideration must be given to the State's interest, including any additional burdens that may be imposed by the procedural safeguards which relator here seeks. From arguments of the parties, we are informed that small utility rate applications are generally handled within the 120-day suspension period, and that the bond provision of W.Va. Code, 24-2-4, is seldom utilized. As might be expected, it is in the large utility rate application that the bond provision is most often invoked.

The respondent Commission urges a number of considerations in opposition to any additional procedural safeguards on the imposition of the requested tariff under bond. While the pivotal question before the Commission is whether a proposed tariff provides a reasonable return, the answer can be determined only in an examination of a mass of accounting data which must be sifted through complex accounting, tax and allocation formulas. It is this process that consumes the suspension period.

The Commission asserts it is not feasible to compress a complex rate case to the point where a meaningful preliminary hearing can be held to determine an appropriate interim rate level pending final determination.

The proceedings and issues involved here differ substantially from those found in the ordinary property deprivation case which involves procedural due process claims, a field that began to be fully explored in *Sniadach v. Family Finance Corp.*, 395 U.S. 337, 23 L. Ed. 2d 349, 89 S.Ct. 1820 (1969). In *Sniadach* and those cases which followed, a certain type of possessory action, by virtue of some statutory authorization, is taken against a person's property with no opportunity to be heard prior to the actual seizure. *See, e.g., Dixon v. Love*, 431 U.S. 105, 52 L. Ed. 2d 172, 97 S.Ct. 1723 (1977); *North*

*Georgia Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601, 42 L. Ed 2d 751, 95 S.Ct. 719 (1975); *Mitchell v. W. T. Grant Co.*, 416 U.S. 600, 40 L. Ed. 2d 406, 94 S.Ct. 1895 (1974); *Fuentes v. Shevin*, 407 U.S. 67, 32 L. Ed 2d 556, 92 S.Ct. 1983 (1972).

In a companion category are those cases where, under a statutory or regulatory provision, a property interest is granted and its subsequent removal by the State necessitates some type of due process procedures. Exemplifying cases in this category are our cases of *Waite, supra*, and *Beverlin v. Board of Education*, W. Va., 216 S.E.2d 554 (1975), and on the federal level, *Memphis Light, Gas & Water Div. v. Craft, supra; Mathews v. Eldridge, supra; Arnett v. Kennedy*, 416 U.S. 134, 40 L. Ed. 2d 15, 94 S.Ct 1633 (1974); *Goldberg v. Kelly, supra.*

The common nexus between these cases is that the property right deprived was capable of fitting within the traditional judicial framework. Generally, the property right or entitlement withdrawn arose out of some activity or condition personal to the possessor and therefore within his knowledge. As a result, it was no insurmountable task for the Court to formulate appropriate procedural safeguards that would provide the individual with an opportunity to present his version of the disputed issue before the deprivation occurred.

Here, we are not confronted with such a condition. The right of relator to just and reasonable utility rates is not individualized. Moreover, the deprivation arises not because of any activity or condition personal to relator, but from complex economic conditions over which he has no control and little knowledge. Consequently, he possesses no facts that bear in any significant manner on the resolution of the disputed issue.

The origin of the right to just and reasonable rates, insofar as that right relates to intervention in the setting of the rates, arises by virtue of our statutes. As this Court decided in *Delardas v. Morgantown Water Commission, supra*, the rate payer cannot seek to enforce the substantive right by a direct action in the courts, but

must contest the reasonableness of the rate through the Public Service Commission. The whole fabric of the proceeding is peculiarly suited to the administrative forum, such that engrafting the adversary legal system into it seems ill advised. *See Dixon v. Love, supra; FCC v. Pottsville Broadcasting Co.*, 309 U.S. 134, 84 L. Ed. 656, 60 S.Ct. 437 (1940).

The complexity of a major rate case does not lend itself to a preliminary review prior to invocation of the rate under bond. Not only is there the risk of needless redundancy for the Commission staff, but there is the very real possibility that such a preliminary hearing would not substantially reduce the margin of possible error inherent in any rate application.

In applying the three factors outlined in *Waite*, it seems to me the scale clearly tips in favor of the State, and as such, the procedural safeguards sought by relator cannot be properly imposed. The relator's deprivation cannot be given additional due process protection, as fundamentally the procedure is peculiar within the administrative forum. There are certain corrective steps that could be accomplished legislatively to improve the process, but they involve primarily a restructuring of the Commission's internal make-up and cannot be thrust judicially on the administrative process.[1] From a constitutional procedural due process standpoint, the statutory requirement of refund with interest is an adequate safeguard.

---

[1] There has been a significant increase in the number of rate filings in the past several years due to the energy crisis, and at the same time additional duties have been placed on the Commission. *See, e.g.*, W.Va. Code, 24-2-11(a) and -14. The obvious result is a substantially increased work load. The State of North Carolina, confronted by the same problems, has attempted to solve them by increasing the number of the Commission to seven members and permitting a panel of three to act for the full Commission. It also authorizes an indefinite suspension period on new rates in cases where the utility has not filed all the information needed for a decision. Finally, it has provided a more accelerated hearing procedure. *See* 1975 North Carolina General Assembly Session Laws, Chapters 48, 184, 243, 510 and 867.