311 S.E.2d 137

**COLUMBIA GAS OF WEST VIRGINIA, INC.**

v.

**The PUBLIC SERVICE COMMISSION OF WEST VIRGINIA.**

**No. 15945.**

Supreme Court of Appeals of West Virginia.

Dec. 14, 1983.

Charles R. McElwee, Kim Brown Poland, William C. Porth, Robinson & McElwee, Charleston, T.E. Morgan, W.R. Barnes & A.J. Sonderman, Columbus, Ohio, for petitioner.

Robert R. Rodecker, William H. Roberts, Legal Div., Charleston, for Public Service Com'n.

HARSHBARGER, Justice:

Columbia Gas Company has petitioned this Court for review of a June 7, 1983 order of our Public Service Commission.

On June 1, 1982, the commission approved Columbia's present rates that provided for a 14.5 percent return to shareholders which included an 11.5 percent return on Columbia's West Virginia investments.

As is so often the case, the next month Columbia asked for another increase pursuant to W.Va.Code, 24-2-4a,[1] in case 82-

1. W.Va.Code, 24-2-4a:

"After the thirteenth day of June, one thousand nine hundred eighty-one, no public utility subject to this chapter except those utilities subject to the provisions of section four-b [§ 24-2-4b] of this article, shall change, suspend or annul any rate, joint rate, charge, rental or classification except after thirty days' notice to the commission and the public, which notice shall plainly state the changes proposed to be made in the schedule then in force and the time when the changed rates or charges shall go into effect; but the commission may enter an order suspending the proposed rate as hereinafter provided. The proposed changes shall be shown by printing new schedules, or shall be plainly indicated upon the schedules in force at the time, and kept open to public inspection: Provided, that the commission may, in its discretion, and for good cause shown, allow changes upon less time than the notice herein specified or may modify the requirements of this section to publishing, posting and filing of tariffs, either by particular instructions or by general order.

"Whenever there shall be filed with the commission any schedule stating a change in the rates or charges, or joint rates or charges, or stating a new individual or joint rate or charge or joint classification or any new individual or joint regulation or practice affecting any rate or charge the commission may either upon complaint or upon its own initiative without complaint enter upon a hearing concerning the propriety of such rate, charge, classification, regulation or practice; and, if the commission so

orders, it may proceed without answer or other form of pleading by the interested parties, but upon reasonable notice, and, pending such hearing and the decisions thereon, the commission, upon filing with such schedule and delivering to the public utility affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, regulation or practice, but not for a longer period than two hundred seventy days beyond the time when such rate, charge, classification, regulation or practice would otherwise go into effect; and after full hearing, whether completed before or after the rate, charge, classification, regulation or practice goes into effect, the commission may make such order in reference to such rate, charge, classification, regulation or practice as would be proper in a proceeding initiated after the rate, charge, classification, regulation or practice had become effective: ... [Provisos regarding rules as to different sized utilities] Provided, however, that if any such hearing and decision thereon is not concluded within the periods of suspension, as above stated, such rate, charge, classification, regulation or practice shall go into effect at the end of such period not subject to refund: Provided, further, that if any such rate, charge, classification, regulation or practice goes into effect because of the failure of the commission to reach a decision, the same shall not preclude the commission from rendering a decision with respect thereto which would disapprove, reduce or modify any such proposed rate, charge, classification, regu-

380–G–42T, seeking a 7.22 percent increase of $21,083,961. Rate change filings become effective thirty days after notice to the commission and public unless the commission enters an order suspending the proposed rates. *See* fn. 1.

On August 27, 1982, the commission suspended the operation of Columbia's new filing for the maximum period then allowed by Code, 24–2–4a: 270 days beyond the thirty-day notice period. In addition, Section 4a provides that "if any such hearing and decision thereon is not concluded within the periods of suspension, as above stated, such rate, charge, classification, regulation or practice shall go into effect at the end of such period not subject to refund". By this suspension order, the commission was required to hear and determine the reasonableness of Columbia's rates by June 8, 1983 or else those rates would go into effect and not be subject to refund provisions, even if unreasonable. We affirmed the constitutionality of this procedure in *State ex rel. Knight v. Public Service Commission*, 161 W.Va. 447, 245 S.E.2d 144 (1978).

On March 12, 1983, the legislature passed a utility reform act that included this portion of W.Va.Code, 24–2B–1 (1983):

[U]pon the effective date [March 12, 1983] of this article, the commission shall authorize no increase of rates charged by any utility for natural gas to any customer of any class for a period of twelve months. With respect to cases for rate increases which are pending before the commission on the effective date [March 12, 1983] of this section, such cases may be suspended by the commission and held in abeyance by the commission during the pendency of the period of suspension mandated by this section or any such

cases may proceed to completion and the commission may rule thereon upon the same to the same extent as if this section had not been enacted, all within the sound discretion of the commission.

It is the application of this new legislation that brings the company here.

Hearings were held several days after that statute became effective in March, 1983. On April 18, the Public Service Commission staff moved to suspend 82–380–G–42T per Code, 24–2B–1. A month later a hearing examiner entered his recommended order that Columbia be given a rate increase of $8.35 million, but that that increase be suspended until March 12, 1984 in accord with the new act. All parties were given fifteen days to file exceptions to this recommended decision.

That same day the commission responded to its staff's motion to suspend the pending rate case pursuant to Code, 24–2B–1, and to Columbia's response in opposition to the staff motion. It issued an order for Columbia to appear and show cause at a May 26, 1983 hearing why its request for increased rates should not be suspended. In that order the Commission announced two principles it would follow when exercising its discretion to suspend pending rate cases:

1. Without a rate increase the Company does not have sufficient revenue to pay reasonable operation and maintenance expenses, taxes, debt service and preferred dividends. The Company should have sufficiently internal generated cash to cover depreciation expense and to pay a reasonable portion of its 1983 construction program; and

2. Whether other relevant factors, such as physical disasters necessitating

lation or practice, in whole or in part, but any such disapproval, reduction or modification shall not be deemed to require a refund to the customers of such utility as to any rate, charge, classification, regulation or practice so disapproved, reduced or modified. The fact of any rate, charge, classification, regulation or practice going into effect by reason of the commission's failure to act thereon shall not affect the commission's power and authority to subsequently act with respect to any such application or change in any rate, charge, classification, regulation or practice. Any rate, charge, classi-

fication, regulation or practice which shall be approved, disapproved, modified or changed, in whole or in part, by decision of the commission shall remain in effect as so approved, disapproved, modified or changed during the period or pendency of any subsequent hearing thereon or appeal therefrom. Orders of the commission affecting rates, charges, classifications, regulations or practices which have gone into effect automatically at the end of the suspension period are prospective in effect only. [The remainder of section is not pertinent to this discussion.]"

emergency construction, periodic principal payments regularly due, etc., exist that require the Commission, in the exercise of its sound discretion to continue Columbia's rate case to completion.

Following the May 26 hearing, the hearing examiner solicited additional briefs from the parties.

On June 6, Columbia and the Consumer Advocate Division of the Public Service Commission (CAD) excepted to the hearing examiner's May 18 decision. The June 8, 1983 effective date for Columbia's applied-for rate was rapidly approaching, and the commission knew that if it did not act, Columbia's proposed new tariffs would go into effect and not be subject to refund. In order to prevent this, the commission issued its June 7, 1983 order affirming the hearing examiner's May 18, 1983 recommendations of a rate increase less than Columbia asked for, and invited the parties to raise the issues once again by filing petitions for further hearing, reopening or rehearing. On June 8, the hearing examiner issued his second decision, based on the May 26 hearing, affirming suspension of Columbia's rates for one year.

Columbia filed petitions for reconsideration of the commission's June 7 order, exceptions to both of the hearing examiner's orders, and a complaint for declaratory judgment and injunctive relief in Kanawha County Circuit Court. The commission's staff and CAD also objected to these decisions.

Kanawha County Circuit Court Judge Robert Harvey heard the parties' preliminary injunction arguments and denied Columbia's motion on June 30, 1983 because it had an adequate remedy by appeal, here; and so we now are asked to decide whether the suspension of rate increases until March 12, 1984, W.Va.Code, 24–2B–1, is unconstitutional as applied to Columbia's pending rate case.[2]

■ In the exercise of its police powers, a state legislature has the right to set rates for public utilities in the public inter-

est. *United Fuel Gas Co. v. Public Service Commission*, 73 W.Va. 571, 80 S.E. 931 (1914); *Boggs v. Public Service Commission*, 154 W.Va. 146, 174 S.E.2d 331 (1970). It may use that power itself or it may delegate it to an agency or authority. *Bluefield Waterworks & Improvement Co. v. Public Service Commission*, 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1976). The legislature or its designated rate-making agency, in this case the West Virginia Public Service Commission, may set any rate it deems just and reasonable, so long as it does not violate the constitutional proscription against confiscation of private property without just compensation found in U.S. Const. amend. XIV, and W.Va. Const. art. III, § 10. *Lumberport-Shinnston Gas Co. v. Public Service Commission*, 165 W.Va. 762, 271 S.E.2d 438, 441 (1980); *United Fuel Gas Co. v. Public Service Commission*, 143 W.Va. 33, 99 S.E.2d 1, 8 (1957); *see also West v. Chesapeake & Potomac Telephone Co.*, 295 U.S. 662, 55 S.Ct. 894, 79 L.Ed. 1640 (1935); *Mountain States Telephone and Telegraph Co. v. New Mexico State Corp. Commn.*, 90 N.M. 325, 563 P.2d 588 (1977); *Utah Power and Light Co. v. Public Service Commission*, 107 Utah 155, 152 P.2d 542 (1944). Deprivation of the right to earn a reasonable rate of return, considering facts and circumstances and economic realities of the times, is governmental confiscation of property. *City of Huntington v. Public Service Commission*, 89 W.Va. 703, 110 S.E. 192 (1921).

■ Rates set by the legislature and the Public Service Commission are presumed to be valid. It is the burden of a utility challenging their presumptive validity to clearly show that rates established are confiscatory. *Federal Power Commission v. Hope Natural Gas Company*, 320 U.S. 591, 602, 64 S.Ct. 281, 287–88, 88 L.Ed. 333 (1944); *Cf., City of Charleston v. Public Service Commission*, 83 W.Va. 718, 99 S.E. 63 (1919); *C & P Telephone Co. v. Public Service Commission*, 171 W.Va.

---

**2.** Lumberport Shinnston Gas Company and Carnegie Natural Gas Company filed a brief as   amici curiae.

708, 301 S.E.2d 798 (1983); *New England Telephone and Telegraph Co. v. Public Utilities Commission,* 354 A.2d 753 (Me. 1976); *New England Telephone and Telegraph Co. v. Public Utilities Commission,* 116 R.I. 356, 358 A.2d 1, 22 (1976); *State ex rel. Laclede Gas Co. v. Public Service Commission,* 535 S.W.2d 561 (Mo. Ct.App.1976).

Columbia has not met that burden.

The United States Supreme Court recognized that the Constitution does not prevent setting maximum or price ceilings and that regulation of industries, including utilities, may limit returns on investments without being confiscatory. *Permian Basin Area Rate Cases,* 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312, *reh. denied,* 392 U.S. 917, 88 S.Ct. 2050, 20 L.Ed.2d 1379 (1968); *Baltimore & Ohio R. Co. v. United States,* 345 U.S. 146, 73 S.Ct. 592, 97 L.Ed. 912 (1953); *Lichter v. United States,* 334 U.S. 742, 68 S.Ct. 1294, 92 L.Ed. 1694 (1948), *reh. denied,* 335 U.S. 836, 69 S.Ct. 11, 93 L.Ed. 389; *Bowles v. Willingham,* 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892, 28 Ohio Ops. 180 (1944). "Regulation may, consistently with the Constitution, limit stringently the return recovered on investment, for investors' interest provide only one of the variables in the constitutional calculus of reasonableness. *Covington and Lexington Turnpike Company v. Sandford,* 164 U.S. 578, 596, 17 S.Ct. 198, 205, 41 L.Ed. 560, 566." *Permian Basin Area Rate Cases, supra,* 390 U.S. at 769, 88 S.Ct. at 1361, 20 L.Ed.2d at 337.

Other courts as well have articulated the difference between constitutionally impermissible confiscatory rates and rates lower than those found to be reasonable.[3] The Fourth Circuit stated:

It is argued that the constitutional guaranty against the enforcement of rates that are confiscatory requires that rates found reasonable be applied to the period of suspension. We do not think so. It has never been so held with respect to railroad rates, and there is no reason why any different principle should apply in the case of gas rates. The holding that certain rates may be allowed as reasonable does not mean that lower rates must be condemned as unreasonable and confiscatory, especially where they are continued in preservation of the status quo during a reasonable period of rate investigation. With changes in economic conditions rates must be changed from time to time, and the lag which necessarily accompanies the making of changes may result to the benefit of the utility as well as to its detriment ....

It is true, of course, that a utility is entitled to rates that are just and reasonable; but this is not to say that rates must fluctuate automatically with every change in economic conditions or that a reasonable time may not be allowed for determining the reasonableness of a proposed increase in rates before it is allowed to go into effect. *Any loss sustained by a maintenance of the status quo while such determination is being made is properly considered, not as a*

---

3. *See e.g., City of Portsmouth v. Public Utilities Commission,* 108 Ohio St. 272, 140 N.E. 604, 606 (Ohio 1923) ("Unjust and unreasonable rates and confiscatory rates are by no means synonymous. A rate which would not be confiscatory in character, by reason of the amount being somewhat above the point of confiscation, yet might not be a reasonable and just rate as between the public and the owner under all the circumstances of the case."); *South Central Bell Telephone Co. v. Louisiana Public Service Commission,* 272 So.2d 667 (La.1973) ("We need not, indeed we cannot, determine what are valid permanent rates and charges. We can determine only whether a continued imposition of present tariffs would constitute confiscation of the Company's property. Although, it may be that the Company should receive a higher rate

of return on its investment and is entitled to have the Commission fix rates and charges which will produce such a return, the record does not justify a finding that the present rate or return is so inadequate as to be confiscatory. We reiterate: We are not here concerned with a determination of reasonable telephone rates and charges or with a valid yield of return on the Company's investment for its operations. We pass only upon the question of whether the Commission's action or inaction amounts to a constitutional violation—that is, confiscation of the Company's property. We hold that the Company has failed to establish that the Commission's enforcement of present rates is tantamount to confiscation.") *See also Potomac Electric Power Co. v. Public Service Commission,* 457 A.2d 776 (D.C.App.1983).

*violation of constitutional right, but as a necessary incident of rate regulation so long as the period of suspension does not "overpass the bounds of reason."* See *American Telephone & Telegraph Co. v. United States,* 299 U.S. 232, 247, 57 S.Ct. 170, 177, 81 L.Ed. 142; *Federal Power Commission v. East Ohio Gas Co.,* 338 U.S. 464, 475, 70 S.Ct. 266, 94 L.Ed. 268.

*Hope Natural Gas Co. v. Federal Power Commission,* 196 F.2d 803, 808–809 (1952), *reh. denied,* 197 F.2d 522. (Emphasis supplied.)

These courts were not discussing rate moratoriums, but the language is relevant to a confiscation concept.

Suspension of rate increases has been sustained, whether a result of "regulatory lag", or legislative decisions making temporary rate increases discretionary with a commission or providing suspension periods. *Hope Natural Gas Co. v. Federal Power Commission, supra; New Rochelle Water Co. v. Public Service Commission,* 31 N.Y.2d 397, 340 N.Y.S.2d 617, 292 N.E.2d 767 (1972); *New England Telephone and Telegraph Co. v. Public Utilities Commission,* 376 A.2d 448 (Me.1977); *New England Telephone and Telegraph Co. v. Public Utilities Commission supra; State ex rel. Laclede Gas Co. v. Public Service Commission, supra; Mountain States Telephone and Telegraph Co. v. Public Utilities Commission,* 345 F.Supp. 80 (D.C.Colo.1972); *South Central Bell Telephone Co. v. Louisiana Public Service Commission,* 272 So.2d 667 (La.1973); *State ex rel. Utilities Commission v. Duke Power Co.,* 285 N.C. 377, 206 S.E.2d 269, 281 (1974).

The *Permian Basin Area Rate Cases, supra,* are strong precedent for the constitutionality of W.Va.Code, 24–2B–1. They challenged adoption of area maximum rates in the regulation of natural gas by the Federal Power Commission. These area maximums were derived from composite cost data and affected individual cases different ways. Provisions were made for special relief when maximum rates caused severe hardships to the companies.

■ Also, the commission imposed a two and one-half year moratorium on filings for prices in excess of the applicable area maximum rate. The court said the relatively brief time, two and one-half years, of the moratorium, and the availability of exceptions in cases of hardship, foreclosed findings of unconstitutional confiscation of property or due process violations.[4]

■ W.Va.Code, 24–2B–1, our legislatively-imposed moratorium on rate increases for natural gas utilities until March 12, 1984, does not offend due process or just

---

4. A three-year rate increase moratorium was approved by the New York Court of Appeals in *Trustees of Village of Saratoga Springs v. Saratoga Gas, Electric Light and Power Co.,* 191 N.Y. 123, 83 N.E. 693, 701 (1908).

We also acknowledge approval of price moratoriums as a valid exercise of police power against constitutional attack as violative of the contracts clause. *Home Building and Loan Assn. v. Blaisdell,* 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413, 88 A.L.R. 1481 (1934). In this type contract clause analysis, courts should ask if there is an overriding public necessity to contend with broad social or economic problems or an emergency situation that permits temporary "infringements". *Home Building and Loan Assn. v. Blaisdell, supra; W.B. Worthen Co. v. Thomas,* 292 U.S. 426, 54 S.Ct. 816, 78 L.Ed. 1344 (1934); *East New York Savings Bank v. Hahn,* 326 U.S. 230, 66 S.Ct. 69, 90 L.Ed. 34, 160 A.L.R. 1279 (1945); *United States Trust Co. v. New Jersey,* 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92, *reh. denied,* 431 U.S. 975, 97 S.Ct. 2942, 53 L.Ed.2d 1073 (1977). In areas where there is regulation and the possibility of future regulation exists, state action affecting private contracts is less likely to be found violative of the contracts clause. *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727, *reh. denied,* 439 U.S. 886, 99 S.Ct. 233, 58 L.Ed.2d 201 (1978); *Veix v. Sixth Ward Building and Loan Assn.,* 310 U.S. 32, 60 S.Ct. 792, 84 L.Ed. 1061 (1940). The rationale and points in this analysis may afford support to a confiscation question as well. *See also Penn Central Transportation Co. v. New York,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), *reh. denied,* 439 U.S. 883, 99 S.Ct. 226, 58 L.Ed.2d 198; *United States v. Grand River Dam Authority,* 363 U.S. 229, 80 S.Ct. 1134, 4 L.Ed.2d 1186 (1960), *reh. denied,* 364 U.S. 855, 81 S.Ct. 33, 5 L.Ed.2d 79. Annot., State's Exercise of Police Power as Constituting Impairment of Obligation of Private Contract in Violation of Contract Clause (Art. I, § 10, cl. 1) of Federal Constitution—Supreme Court Cases, 57 L.Ed.2d 1279 (1979 and Supp.).

compensation provisions in the Fourteenth Amendment to the United States Constitution, nor our State Constitution, Art. III, § 10. As applied to Columbia, the suspension at most suspends Columbia's rates from June 8, 1983 until March 12, 1984, a period of about an additional nine months.

In *State ex rel. Knight v. Public Service Commission,* 161 W.Va. 447, 245 S.E.2d 144 (1978), we recognized the legislature's leeway in balancing the interests of consumers and utility companies in the process of determining reasonable rates. Code, 24-2B-1 was a deliberate effort to "mitigate the adverse consequences of [recent] dramatic rate increases", to give the Public Service Commission an opportunity to study the effects of transactions between utilities and affiliates in contributing to the substantial increase in natural gas and electricity prices, and "to limit the return of a utility to a proper level when compared to return or profit that affiliates earn on transactions with sister utilities." W.Va. Code, 24-1-1(h)(1) and (i).

The legislature made provisions for cases in which the moratorium might cause confiscation of private property without just compensation. Under Section 2 of Article 2B,[5] a gas utility can petition for an emergency rate increase during the moratorium if it can show it is experiencing extreme financial hardship as a result of the moratorium. This is in effect saying that if the rate becomes confiscatory, the utility company can seek increases that will equal just compensation. It must be remembered that there is a difference between rates being confiscatory and being compensatory. See discussion *supra.*

The presence of this emergency rate procedure for cases of extreme financial hardship answers claims that Code, 24-2B-1 is unconstitutional. If, as Columbia asserts, it is unable to pay its operating expenses, meet its debt service, and provide some return to its share holders, a remedy is provided within the commission's jurisdiction.

Columbia's second major argument is that the Public Service Commission's discretion to suspend pending rate cases is improper because W.Va.Code, 24-2B-1, is a standardless delegation of legislative authority.

The Public Service Commission makes rates on a continuous basis from standards in W.Va.Code, 24-1-1(a) and (b). Specifically, Section (a)(4) requires that "rates and charges for utility services [be] just, reasonable, applied without unjust discrimination or preference and based primarily on the cost of providing these services." Subsection (b) charges the Public Service Commission with responsibility for "appraising and balancing the interests of current and future utility service customers, the general interests of the State's economy and the interests of the utilities subject to its jurisdiction in its deliberations and decisions."

If these standards are sufficiently explicit for the exercise of the Public Service Commission's discretion in basic rate-making functions, they certainly are adequate for the lesser exercise of discretion required in a temporary suspension of rates.

■ Columbia complains that the commission is not given even a clue about factors it should consider in exercising this discretion. We believe that the legislative purposes behind the enactment of W.Va. Code, 24-2B-1, and the Public Service Commission's general guidelines in Code, 24-1-1 are sufficiently detailed to make Code, 24-2B-1 a valid delegation of legislative power. *See State ex rel. West Virginia Housing Fund v. Waterhouse,* 158 W.Va. 196, 212 S.E.2d 724, 733 (1974); *State ex*

---

5. W.Va.Code, 24-2B-2:

"During the period of temporary suspension of rates generally, as provided herein, the commission may upon petition by a utility allow an emergency rate to take effect, subject to future modification by the commission and subject to refund to the customers of such utility, if it is determined that such emergency rate is necessary to protect the utility from extreme financial hardship and if that financial hardship is attributable solely to the temporary suspension of rate increases. The commission shall provide by rule and regulation criteria for determination of extreme financial hardship within the meaning of this section. Such petition shall be subject to the same notice requirements as set forth in article two, section four-a [§ 24-2-4a] of this chapter."

*rel. Callaghan v. West Virginia Civil Service Commission,* 166 W.Va. 117, 273 S.E.2d 72 (1980). We noted in the Housing Fund case that "great leeway is allowed the legislature in setting forth guidelines and standards ... the mere fact that the standards set forth are general rather than specific does not militate against their acceptance and validity. The exigencies of modern government have increasingly dictated the use of general standards rather than minutely detailed standards." 158 W.Va. at 213–214, 212 S.E.2d, at 734. We have also recognized that in complex areas where detailed standards cannot be set up, their absence does not make a legislative delegation of discretionary power unconstitutional. *Meisel v. Tri-State Airport Authority,* 135 W.Va. 528, 64 S.E.2d 32 (1951).

Finding no constitutional right or protection to have been denied Columbia, we affirm the Public Service Commission.

Affirmed.