Roy E. **GARRIS** d/b/a Garris
Insurance Co., Appellant,

v.

**HANOVER INSURANCE COMPANY,**
Appellee.

No. 79–1165.

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 10, 1980.

Decided Sept. 4, 1980.

Donald E. Jonas, David M. Ratchford, Ratchford, Cooper & Jonas, Columbia, S. C. (W. Ralph Garris, Roy E. Garris, Jr., Garris & Garris, Columbia, S. C., on brief), for appellant.

R. Bruce Shaw, Columbia, S. C. (Thornwell F. Sowell, III, Nelson, Mullins, Grier & Scarborough, Columbia, S. C., on brief), for appellee.

Before PHILLIPS and MURNAGHAN, Circuit Judges, and John A. MacKENZIE, United States District Judge for the Eastern District of Virginia, sitting by designation.

JAMES DICKSON PHILLIPS, Circuit Judge:

Roy E. Garris d/b/a Garris Insurance Company (Garris) appeals the entry of summary judgment in favor of Hanover Insurance Company (Hanover) in Garris' suit for wrongful cancellation of his agency contract with Hanover. The district court held that S.C.Code § 38–37–940(2) (1976), which Garris contends prohibits the cancellation, could not constitutionally be applied to the contract between Hanover and Garris because it violated the Contract and Due Process Clauses of the federal Constitution. We hold that to the extent it confers a private cause of action for termination of agency contracts entered into before its enactment, it violates the Contract Clause.

### I

Garris and Hanover entered into the agency agreement on May 15, 1974. The agreement provided that the Garris Insurance Agency, an independent insurance agency located in Columbia, South Carolina, would act as an agent for Hanover writing various types of insurance. Either party could unilaterally terminate the agency on sixty days written notice.

On July 9, 1974, the General Assembly passed the South Carolina Automobile Reparation Reform Act of 1974, Act No. 1177, 1974 S.C. Acts 2718 ("Act 1177"). Act 1177 effected sweeping changes in the sale of automobile insurance in South Carolina. Before the Act insurance was sold on a voluntary market with an assigned risk plan for those otherwise unable to obtain insurance. Act 1177 provided that no insurer could differentiate between drivers in the rates charged except on the basis of criteria set by the Insurance Commissioner, effectively requiring each insurer to establish uniform rate schedules. Neither insurers nor their agents could refuse an application by any licensed driver for automobile insurance at these set rates. Some of the risks that insurers were statutorily required to accept could in fact be avoided, as each insurer could place up to thirty–five percent of its book of business in a reinsurance facility in which all insurers participated.

In addition to placing upon agents and insurers this mandatory duty to accept all risks thus deemed by the statute to be insurable, the Act provided that

No insurer of automobile insurance shall cancel its representation by an agent primarily because of the volume of automobile insurance placed with it by the agent on account of the statutory mandate of coverage nor because of the amount of the agent's automobile insurance business which the insurer has deemed it necessary to reinsure in the Facility.

S.C.Code § 38–37–940(2) (1976).

By a letter of May 18, 1976, Hanover exercised its right under the agreement to terminate Garris' agency. Garris then brought this action in the Court of Common Pleas for Richland County, South Carolina, alleging that his termination was in violation of § 38–37–940(2), and seeking injunctive and monetary relief. Hanover removed the case to federal court on the basis of diversity of citizenship.

The district court initially granted summary judgment to Hanover, holding that Garris had no standing to bring the action, as the provision was not for the protection of insurance agents, but for the protection of the public. While appeal was pending to this court, however, the South Carolina Supreme Court held that the provision did create in the agent a cause of action for the wrongful termination of his agency. *G–H Insurance Agency, Inc. v. Travelers Insurance Co.*, 270 S.C. 147, 241 S.E.2d 534 (1978). We remanded in light of that decision.

On remand, Hanover again moved for summary judgment on the basis that its contract with Garris, entered into before the enactment of Act 1177, allowed it to terminate his agency for any reason. The application of § 38–37–940(2) to that agreement would violate the Contract Clause of the Constitution and Hanover's due process rights. The district court agreed and again granted summary judgment. Garris appealed, challenging the district court's constitutional rulings. The issue before us is a

narrow one: the constitutionality of § 38–37–940(2) as authoritatively interpreted by the South Carolina Supreme Court to have created in cancelled agents a private cause of action. We believe that the retroactive application of this private enforcement provision violates the Contract Clause and affirm the grant of summary judgment for the defendant.

## II

Two contemporary decisions of the Supreme Court provide the appropriate framework for analysis and resolution of the Contract Clause[1] issue here. In *United States Trust Co. v. New Jersey*, 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977), and, again, in *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978), the Court has recently reasserted the ongoing vitality of the Contract Clause[2] in finding state legislation impermissibly violative of private contractual rights. In the process the contours of the Clause's protections have been reexamined, so that discussion properly starts with these decisions.

In *United States Trust* the Court held unconstitutional state legislation that removed an existing statutory limit on the ability of state port authority officials to subsidize rail transportation from revenues and reserves pledged as security for the authority's bonds. Recognizing that "[t]he States must possess broad power to adopt general regulatory measures without being concerned that private contracts will be impaired, or even destroyed, as a result," lest persons be made "able to obtain immunity from state regulation by making private contractual arrangements," the Court nevertheless pointed out that this undoubted power was ultimately subject to the prohibition contained in the Contract Clause. "Legislation adjusting the rights and responsibilities of contracting parties must be *upon reasonable conditions* and *of a character appropriate to the public purpose* justi-

fying its adoption." 431 U.S. at 22, 97 S.Ct. at 1518 (emphasis added). Conceding that courts engaged in constitutional review must ordinarily accord deference to legislative judgments of reasonableness and appropriateness under this test, but noting that stricter judicial scrutiny may be in order where public contracts, hence state self–interest, are involved, the Court held that the challenged legislation unconstitutionally impaired the contractual obligations of bond issuers to bondholders. Because it eliminated important security provisions without attempting any accommodation to bondholder interests, it was not saved by any conditions reasonably protective of the admittedly impaired contractual obligations. Furthermore, it was not shown that the agreed public purpose of discouraging automobile use and improving mass transit could not have been achieved by other means that would not have involved so drastic an impairment of contractual obligations owed by the state. Hence the test of appropriateness to public purpose was not met and the challenged law must fall.

Concededly more apposite to the instant case is *Allied Structural Steel* because it too involved wholly private contractual obligations with state self–interest in the contract obligations not a complicating factor. In that case, Allied Structural Steel Company (Company) had adopted in 1963 a pension trust plan for employees of its Minnesota facility. The plan provided pension benefits for employees upon their retirement at stated ages or upon their meeting certain other conditions of age and longevity; but the company, as the sole contributor to the plan, both administered the actuarial computations determining the amount of contributions, and retained the unilateral power to amend the plan in whole or in part and to terminate it entirely with a distribution of assets to employees. In 1974 Minnesota enacted the challenged legislation. It provided that private employers with pen-

---

[1] "No State shall . . . pass any . . . Law impairing the Obligation of Contracts. . . ." U.S.Const. Art. I, § 10, cl. 1.

[2] *See generally* Schwartz, *Old Wine in Old Bottles? The Renaissance of the Contract Clause*, 1979 Sup. Ct. Rev. 95 (1980).

sion plans like the Company's would be subject under certain conditions to a "pension funding charge" for the benefit of their covered employees if they terminated a plan or closed a Minnesota facility. Shortly after this legislation was enacted, Company closed its Minnesota facility pursuant to earlier plans. When the State sought to impose upon it a "pension funding charge," the Company attacked the legislation's constitutionality under the Contract Clause.

In considering the constitutional attack, the Court began its analysis, as it had in *United States Trust*, by conceding the police power of the states to modify existing contractual rights. But "[i]f the Contract Clause is to retain any meaning at all . . . it must be understood to impose *some* limits upon the power of a State to abridge existing contractual relationships, even in the exercise of its otherwise legitimate police power." 438 U.S. at 242, 98 S.Ct. at 2721 (emphasis in original). The existence of these limits was suggested by the very cases generally viewed as having announced the rule of deference to the legislative judgment where economic regulation modified contractual rights. Most critical in this respect was the decision in *Home Building & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934). There the Court had upheld against Contract Clause attack a mortgage moratorium law enacted by Minnesota to provide relief for homeowners threatened by foreclosure. That result, however, turned on the specific facts of the case:

> Although the legislation conflicted directly with lenders' contractual foreclosure rights, the Court there acknowledged that, despite the Contract Clause, the States retained residual authority to "enact laws to safeguard the vital interests of [their] people." In upholding the state mortgage moratorium law, the Court found five factors significant. First, the state legislature had declared in the Act itself that an emergency need for the protection of homeowners existed. Second, the state law was enacted to protect a basic societal interest, not a fa-

vored group. Third, the relief was appropriately tailored to the emergency that it was designed to meet. Fourth, the imposed conditions were reasonable. And, finally, the legislation was limited to the duration of the emergency.

*Allied Structural Steel*, 438 U.S. at 243, 98 S.Ct. at 2721 (citations and footnote omitted).

■ It does not minimize the contemporary significance of *United States Trust* and *Allied Structural Steel* to note. that they simply refine and update the traditional balancing test between reserved state police power and private contractual obligations that has always been required in Contract Clause analysis. In the process they have newly highlighted a number of factors critical to fair application of the test and have suggested a helpful staged sequence for analysis of these factors. While there might be some question about the precise stage at which the various factors are most appropriately considered, all can be taken into account in an analysis that asks in sequence: (1) Has there been an impairment of contractual obligation sufficiently severe to generate further constitutional concern? (2) If so, is the impairment nevertheless saved against constitutional infirmity because (a) it is imposed upon reasonable conditions that adequately protect the admittedly impaired interests, or (b) it is in any event reasonable and necessary to the accomplishment of a discernible public purpose lying within reach of the state's police power?

In making this analysis here it is important to keep in mind that the legislation under challenge—hence the focus of the analysis—is not the comprehensive Act 1177 of which the challenged legislation is merely a part, nor even the prohibitions of § 38–37–940(2), but only the *private enforcement* provision for the violation of that section.

### A.

We first conclude that the challenged legislation does so severely impair substantial

existing contract obligations by its retroactive application that its reasonableness and necessity in relation to a public purpose must be put to constitutional test. This is not legislation such as the state law shortening the time for reinstatement of a defaulted land claim that was upheld against Contract Clause challenge in *City of El Paso v. Simmons*, 379 U.S. 497, 85 S.Ct. 577, 13 L.Ed.2d 446 (1965). There the right to a particular time could not have been a significant factor in the claimant's bargaining expectations. *See Allied Structural Steel,* 438 U.S. at 243 n.14, 98 S.Ct. at 2722 n.14. Here, on the contrary, the right of unilateral termination upon sixty days notice for which Hanover bargained must be accounted a critical feature of its total contractual relationships with its agents. It insured that an unprofitable relationship or one simply plagued with nagging personal or administrative problems that made its overall value questionable could be cut off without any expense or delay arising from need to justify it either out of court or in court. In view of the obvious value of this contractual right, Hanover's reliance upon it as a critical aspect of its agency relationship is manifest. The challenged legislation severely modified this contractual right. Although it literally prohibits termination only for a single narrow cause, its effect is to make every termination subject to costly and disruptive legal challenges with no guarantee that even "rightful" terminations would be so adjudged in the always chancey litigation process.

The right impaired and the severity of its impairment are closely comparable to those involved in state legislation designed to protect local distributors and dealers against unilateral cancellations or terminations by their suppliers or manufacturers. The reaction of two courts to such legislation under Contract Clause attack is particularly apt.

In *Globe Liquor Co. v. Four Roses Distillers Co.*, 281 A.2d 19 (Del.1971), *cert. denied,* 404 U.S. 873, 92 S.Ct. 103, 30 L.Ed.2d 117 (1971), the Supreme Court of Delaware held the Delaware Franchise Security Law, which prohibited the cancellation of franchise agreements except for "just cause"

and on reasonable notice, unconstitutional in its application to a sole distributorship annually renewable at the supplier's option. "The effect of the . . . Law," said the court,

> is to transform the contract . . . from one providing for a period of one year only with no right of renewal . . . to a contract to extend into the indefinite future which [the supplier] may terminate only upon certain conditions and at its peril.

*Id.* at 21.

In *Fornaris v. Ridge Tool Co.*, 423 F.2d 563 (1st Cir.), *rev'd on other grounds,* 400 U.S. 41, 91 S.Ct. 156, 27 L.Ed.2d 174 (1970), the First Circuit similarly found unconstitutional the retroactive application of Puerto Rico's Dealer's Contract Law, which prohibited the termination of dealerships except for "just cause," defined as a substantial failure of performance. "No amount of research by parties or amici," the court said,

> has discovered a case suggesting that to convert a contractual relationship terminable by either party without cause into one which, short of breach by the other party, can be terminated by one of the parties only by making substantial payments and without protection for its economic interests, is not a change of great magnitude.

*Id.* at 568. For the reasons cogently given by the *Globe* and *Fornaris* courts, we consider the right and impairment here involved to be of comparable magnitude. *See also Superior Motors, Inc. v. Winnebago Industries, Inc.*, 359 F.Supp. 773 (D.S.C. 1973); *Opinion of the Justices*, 283 A.2d 832 (Del.1971).

We turn next to Garris' contention that because of the regulated nature of the insurance industry, Hanover could have had no rightful expectation that its private contractual relationship was not subject to just such legislative alteration as it now attacks. This, it is asserted, negates any apparent significance of contract right or severity of its impairment. We are not persuaded.

■ It is certainly the case that a party who has "purchased into an enterprise already regulated in the particular to which he now objects" · cannot claim Contract Clause protection in that particular. *Veix v. Sixth Ward Building & Loan Ass'n*, 310 U.S. 32, 38, 60 S.Ct. 792, 795, 84 L.Ed. 1061 (1940). But while it is indisputable that in South Carolina, as elsewhere, the insurance industry has traditionally been subjected to state regulation, there is no indication that the particular contractual relationship here involved has, as such, ever been caught up in the general scheme of regulation. Rather, the company–agency contractual relationship seems itself to have been outside the range of state regulatory interest.[3] Certainly there was no regulation of the contractual relationship in place when Hanover and Garris entered into their agency contract.

Garris' principal contention here seems to be that the state's annual licensing requirement for all insurance companies imposed express limitations upon any contractual expectations that Hanover might reasonably have had in this particular. As an obligation of its license to do business in the state, Hanover was at all times subject to the statutory condition that it "perform all duties now or hereafter prescribed by law." S.C. Code § 38–5–70. From this, Garris contends, it is manifest that insurance companies such as Hanover could place no rightful reliance upon the continued applicability of law existing when they entered

into agency contracts. Support for this view is sought in cases such as *Doyle v. Continental Insurance Co.*, 94 U.S. 535, 24 L.Ed. 148 (1876), holding that the rights conferred by a license are not protected against subsequent impairment by a state's exercise of its police power. The simple response is that Hanover is not here asserting any constitutional right to continued exercise of its license to do business in the state, but is seeking to have enforced contractual relationships entered into while duly licensed. Abrogation of contractual relationships "cannot be justified by saying that in the public interest the operations of [businesses affected with a public interest] may be controlled and regulated, or that in the same interest their charters may be amended." *Treigle v. Acme Homestead Ass'n*, 297 U.S. 189, 196, 56 S.Ct. 408, 411, 80 L.Ed. 575 (1936). Neither can alterations of significant contractual rights be justified by saying that in the public interest the party asserting the rights was subject to licensing under the police power of the state.

**B.**

We can pass quickly over any possibility that the legislation might be saved by any special conditions ameliorating its ultimate impact. Here, as in *Allied Structural Steel*, there was no "provision for gradual applicability or grace periods." 438 U.S. at 247, 98 S.Ct. at 2724. No opportunity was given to renegotiate agency contracts – whether or not any practical possibility for doing so

---

3. Under the South Carolina statutory pattern that existed prior to the enactment of Act 1177, there were apparently only three sections that pertained at all to the agent–company relationship. S.C. Code § 37–231 (1962) (current version at S.C. Code § 38–51–20 (1976)) required that every agent of an insurance company be licensed by the state. Section 37–251 (current version at § 38–51–210) provided that an agent who negotiated a contract of insurance was the company's agent for purpose of premium payments regardless of specific provisions of the policy or the agency contract. Section 37–234 (current version at § 38–51–50) required that all applicants for agents' licenses be vouched for by the company for whom they were to act; that the company certify that it had investigated the applicant's character and trustworthiness; and that upon the cancellation of an

agency contract, the company notify the commission giving the reasons. In *Johnson v. Independent Life & Accident Insurance Co.*, 94 F.Supp. 959 (D.S.C. 1951), it was noted that the reporting requirement in the last section was to aid the insurance department in discharging its licensing function.

Significantly, none of the cited sections pertained to the company–agent relationship as it was ordered by contract between those parties.

Also significant on the point is the candid observation by the Association of Independent Insurance Agents of South Carolina in its amicus brief, at 4–5, that both it and the national federation with which it is associated generally favor a continued hands–off legislative policy with respect to the contractual relationship here involved.

existed. No limited period for unilateral terminations under existing contracts was provided. The impact of the legislation was thus immediate, irrevocable, and without limit of time, in binding[4] the insurance company in a completely altered, economically disadvantageous relationship with every agent with whom it had an agency contract on the effective date of the legislation.

### C.

Having concluded that the contractual right asserted by Hanover is of sufficient magnitude and its impairment of sufficient significance to require constitutional balancing against the state's police power, and that the impairment was not ameliorated by any special conditions affecting the law's applicability, we turn finally to the most difficult issue: whether the challenged legislation is "upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption." *Allied Structural Steel*, 438 U.S. at 244, 98 S.Ct. at 2722 (quoting *United States Trust*, 431 U.S. at 22, 97 S.Ct. at 1517). This is, of course, the question whether the limits imposed by the Contract Clause upon exercise of the state's otherwise legitimate police power have been here exceeded.

At the outset of our consideration of this question, we repeat for emphasis a point earlier made – that the question is properly referable solely to the private enforcement provision of § 38–37–940(2), rather than to the general insurance law reform package of which it is a part. This is not to say that questions of reasonableness and appropriateness of specific provisions may not take into account their total statutory context – indeed they must. But it is to emphasize that a public purpose that might clearly undergird a general exercise of police power will not necessarily protect all its parts from Contract Clause limitations on that power. *See United States*

*Trust*, 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92.

We think the proper mode of analysis of this critical question is that suggested by the opinion in *Allied Structural Steel*. There the Court tested the challenged legislation in terms of the five characteristics that in *Home Building & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934), had been found sufficient in combination to withstand Contract Clause attack. As the *Allied Structural Steel* Court noted, the clear implication of the *Blaisdell* opinion was that "if the [*Blaisdell*] legislation had not possessed the characteristics attributed to it by the Court, it would have been invalid under the Contract Clause. . . ." *Allied Structural Steel*, 438 U.S. at 242, 98 S.Ct. at 2722.

Those characteristics were, in summary: (1) its emergency nature; (2) its purpose to protect a broad societal interest, not a favored group; (3) the tailoring of its remedial effect to its emergency cause; (4) the reasonableness of its basic features; and (5) its limited effect in temporal terms. It is easily seen that of these the no–termination provision does not possess characteristics (1), (3) or (5). Like the pension fund legislation in *Allied Structural Steel*, the private enforcement provision of § 38–37–940(2) was "not enacted to deal with a situation remotely approaching the broad and desperate emergency economic conditions of the early 1930's" that underlay the *Blaisdell* legislation. *Allied Structural Steel*, 438 U.S. at 249, 98 S.Ct. at 2725. Not being grounded in such a cause, it was not designed merely to remedy a passing crisis, but to deal once and for all with an ongoing problem in the relationship between insurance companies and their agents.

Finally, like the bond covenant legislation in *United States Trust*, and unlike the *Blaisdell* moratorium, it "did not effect simply a temporary alteration of . . . contractual relationships . . . but worked a severe, permanent and immediate

---

4. That the "binding" is practical rather than legal, since the South Carolina courts will not enjoin a termination prohibited by § 38–37–940(2), *Van Robinson Ins. Agency, Inc. v. Har-leysville Mut. Ins. Co.*, 272 S.C. 127, 249 S.E.2d 744 (1978), makes it no less real for purposes of our analysis.

change in those relationships—irrevocably and retroactively." *Allied Structural Steel*, 438 U.S. at 250, 98 S.Ct. at 2726. *See* Part II.B. *supra*.

█ There remain the questions whether the purpose of the law was to protect a broad societal interest as opposed to the interest of a favored group, and whether its essential features were reasonably related[5] to a public purpose. These are the most difficult questions presented, for whereas the preceding inquiries have to do with objectively determinable characteristics of the legislation as finally enacted, these last two require consideration of the ends and means chosen by the state legislature to effectuate social, economic and political policy lying within general reach of its police power. In this sensitive realm our duty is simply and inescapably to give our independent,[6] considered judgment[7] as to whether the legislative enactment makes a rational accommodation between the affirmative power exercised by the state and the negative safeguard embodied in the. Contract Clause. *See* A. Bickel, *The Least Dangerous Branch*, 37–41 (1962). Our conclusion on these matters is that the predominant purpose of the challenged provision was to protect the private interests of affected insurance agents rather than any broader societal interest; and that its essential fea-

5. In *United States Trust* the test is put in terms of the impairment's having to be "both reasonable *and necessary*" if it is to pass Contract Clause muster. 431 U.S. at 29, 97 S.Ct. at 1521 (emphasis added). Although *United States Trust* involved a public contract requiring closer scrutiny, *id.* at 30–31, 97 S.Ct. at 1521–1522, the Court indicated that the "reasonable and necessary" test applied as well to private contract cases. *Id.* at 22, 97 S.Ct. at 1517. One commentator has suggested that in private contract cases "the emphasis on review is on the adjective 'reasonable,'" while "[i]n public contract cases, the emphasis is on the adjective 'necessary.'" Schwartz, *supra* note 2, at 109. Our analysis has proceeded on the assumption that the provision here challenged could pass muster notwithstanding it could not be said to be strictly necessary in the sense that no less intrusive alternative was available to serve the asserted public purpose. That is to say, to the extent a dual standard is posited by *United States Trust* and *Allied Structural Steel*, we have considered that of *Allied Structural Steel* the appropriate one for our analysis.

6. In making an independent constitutional judgment, we of course owe proper deference to the prior legislative judgment in enacting the challenged provision, *United States Trust*, 431 U.S. at 22–23, 97 S.Ct. at 1517–1518, a deference sometimes expressed as a "presumption of constitutionality." But we do not understand this to constitute the sort of presumption affecting proof for which Garris apparently contends on this appeal.

We also acknowledge a deference – based upon considerations of comity and of natural respect - properly owed a prior judicial determination of the Supreme Court of South Carolina upholding the challenged provision against the same constitutional attack here made. *Rowell v. Harleysville Mut. Ins. Co.*, 272 S.C. 108, 250 S.E.2d 111 (1978). With all respect, we observe of that contrary judicial judgment - as did the district judge in the instant case – that it was by a 3–2 split decision in which the majority did not, as did the dissenting justices, analyze the Contract Clause issue under the test of *United States Trust* and *Allied Structural Steel. See* note 10 *infra*.

7. To make this considered judgment, we draw of necessity upon the sources commonly drawn upon for constitutional adjudication: "constitutional facts" of record, judicial notice, authoritative decisions of other courts making comparable constitutional evaluations, and relevant policy concerns advanced in the briefs of parties and *amici*.

Garris has contended here that the summary judgment record does not present an adequate factual basis for making this judgment and suggests that at a minimum the case should be remanded for fuller factual development. We disagree. The relevant "historical" facts - few in number, simple, and indisputable - are in the record. Together with the text of the constitutional article invoked and the relevant state statutes as supplemented by the other sources identified, these constitute the usual body of authoritative materials for constitutional review of legislative enactments. The various public policy concerns that properly inform both the legislative process of enactment and the judicial process of constitutional review are more the subject of "expert opinion" about probable consequences than of factual evidence of historical fact, and are before us in considerable volume in the written briefs of parties and *amici*. There is no official legislative history to be considered. We have considered the unofficial analysis of the stated purposes and the intended consequences of the relevant legislation found in Note, *The South Carolina Automobile Reparation Reform Act (Part II): Compulsory Insurance - A Synopsis and Appraisal*, 27 S.C.L.Rev. 919 (1976).

tures were not in any event reasonably related to the public purpose asserted for Act 1177 by the legislature.

■ We look first to the public purpose asserted for the provision. It is the public purpose that concededly underlay Act 1177 of which it was a part: to make compulsory automobile liability insurance available on a nondiscriminatory basis to all drivers licensed by the state. The contention is that the protection afforded insurance agents by the challenged provision is so essential to accomplishment of this general public purpose that that purpose must be taken to be the purpose undergirding the creation of a private cause of action in agents for wrongful termination.

We cannot accept this as a proper assessment of the relationship borne by the challenged provision to the general public purpose behind Act 1177. To do so would require acceptance of the proposition that the protections provided insurance agents by this private right of action are necessary to insure that every licensed driver in the state will be able to procure liability insurance on a nondiscriminatory basis; in effect, that the purposes can only be achieved if drivers remain able to procure insurance from those very agents under contract with insurance companies when the challenged provisions took effect. This is not a supportable proposition. While it may well be supposed that without the protection of this provision many agents would suffer serious economic disruption [8] and that many drivers might in consequence be temporarily put to varying degrees of practical inconvenience in procuring insurance, other provisions of Act 1177 nevertheless insure that the basic

public purpose will yet be realized. In the first place, insurers may not refuse to write or renew the policies of anyone deemed by the statute to be an insurable risk, nor may they cancel the insurance of anyone except for reasons that would justify a refusal to write or renew that person's policy. S.C. Code § 38–37–310; *see also* § 38–37–320. Next, even if an agent were to be terminated by all of the companies for whom he wrote policies, the Insurance Commissioner is empowered to assign or designate a carrier for whom the agent could write liability insurance, with the company then able to cede 100% of that agent's business to the reinsurance facility. S.C.Code § 38–37–150. Finally, the Act provides that no company may refuse to write or renew a policy for a qualified insured upon request, even if the agent who wrote the policy has been cancelled. S.C.Code § 38–37–920. In combination,[9] these features of the Act provide such guarantees that its general public purpose will be achieved notwithstanding that the further provision of a private cause of action for certain terminations cannot be deemed necessary or appropriate to its achievement.

That the essential purpose and effect of the private enforcement provision of § 38–37–940(2) was to further purely private rather than any broad public purpose is vividly demonstrated by the perceptions had of its purpose and effect by the very court that found the provision implicit in § 38–37–940(2) though it was not there expressly conferred. As earlier noted, in *G–H Insurance Agency, Inc. v. Travelers Insurance Co.*, the Supreme Court of South Carolina was faced with the precise issue

---

**8.** We accept as a general proposition the likelihood that under the impact of Act 1177's assigned risk features, insurance companies are more likely to attempt to free themselves of their relationships with those agents with histories of "bad risk" writing, and that the private enforcement provision provides those agents greater protection than that provided by the administrative sanctions of § 38–37–940 alone. Indeed, evidence in the instant case strongly supports the validity of the assumption, and no one disputes its general validity. We therefore accept that the challenged provision might well be necessary or certainly appropriate to accom-

plish a legislative purpose of protecting the economic interests of this particular segment of the insurance industry. But that has never been asserted, nor could it fairly be asserted, as a broad "public purpose" justifying the impairment of contractual obligation in question.

**9.** Assuming that the prohibition of § 38–37–940(2) is not unconstitutional, but only the retroactive application of the private enforcement provision of that section, the administrative sanctions of § 38–37–940 also serve to assure the achievement of the broader public purposes of Act 1177.

whether § 38–37–940(2) conferred a private cause of action. Existing law had it that no private right of action existed for violation of a regulatory statute enacted for a public purpose, *e. g., Taggart v. Home Finance Group, Inc.*, 239 S.C. 345, 123 S.E.2d 250 (1961), so that the question of the public or private thrust of this provision was critical to decision. The court held that the purpose of § 38–37–940(2) was "largely" to confer a private benefit upon the insurance agent, *G–H Insurance Agency, Inc.*, 241 S.E.2d at 536, and mainly justified its conclusion on the very basis that–as we have observed–other provisions of Act 1177 adequately served the broad public purposes of the Act.[10] Our own analysis of the private–public thrust of the challenged provision and of its appropriateness to serve the broad public purpose asserted for it is thus

bolstered by the analysis of the very court that found implicit in the statute the feature now challenged.

For the foregoing reasons we hold that under the test of *United States Trust* and *Allied Structural Steel*, retroactive application of the private enforcement provision of S.C.Code § 38–37–940(2)[11] impermissibly impairs the obligations of the agency contract between Garris and Hanover under the Contract Clause, and that in consequence the district court did not err in granting summary judgment in favor of Hanover.[12]

AFFIRMED.

---

**10.** The Supreme Court of South Carolina was of course confronted with these very conclusions when in *Rowell v. Harleysville Mut. Ins. Co.*, 272 S.C. 108, 250 S.E.2d 111 (1978), it was later required to decide the issue before us–whether the private enforcement provision of § 38–37–940(2) violated the Contract Clause. In that context its earlier conclusion in *G–H* that the purpose of § 38–37–940(2) was "largely" to protect private interests rather than to further the broad public purpose undergirding Act 1177 of course militated against the provision's constitutionality, and this point was predictably urged upon it. The state supreme court's response was that it had in *G–H* only pointed out that § 38–37–940(2) was "not limited in its purpose and application to the benefit of the public to the exclusion of insurance agents" and recognized "the dual aspect of the protection afforded." 250 S.E.2d at 114. Since in *G–H* it therefore had not held that § 38–37–940(2) "served *no* public purpose"; since § 38–37–940(2) was "a part of the system adopted . . . to secure compliance with . . . Act No. 1177"; and since insurance companies "had no vested right to sell insurance in [the] State," the private enforcement provision "violated no constitutional rights." *Id.* at 114 (emphasis added). With all respect, and passing any questions presented by the court's appraisal of its holding in *G–H*, we observe that this analysis simply does not comport with that mandated by *United States Trust* and *Allied Structural Steel*, particularly in its suggestion that the Contract Clause would be violated only if *no* public purpose could be considered served by challenged legislation. Neither decision, significantly, was cited in the majority opinion. *Cf. Pulliam v. Doe*, 246 S.C. 106, 142 S.E.2d 861 (1965). We also call atten-

tion to the distinction between the private enforcement provision found implicit in the statute by the South Carolina Supreme Court and the administrative sanctions expressly provided by the statute. *See* note 11 *infra*.

**11.** Our consideration and decision is expressly limited to the unconstitutionality of the private enforcement provision of § 38–37–940(2) as construed by the South Carolina Supreme Court in *G–H Ins. Agency, Inc.*, 241 S.E.2d 534, on the basis that this is the only question of a constitutional nature whose resolution was "absolutely necessary to a decision of the case," *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 346–47, 56 S.Ct. 466, 80 L.Ed. 688 (1935) (Brandeis, J., concurring). To the extent the district court's memorandum opinion might be read to hold § 38–37–940(2) unconstitutional in all respects, we disapprove that court's consideration of any wider constitutional question than that presented by the private enforcement provision.

In expressly avoiding the wider question, we note only that the question whether administrative enforcement of § 38–37–940(2) would also violate the Contract Clause would be a different one under the constitutional test here applied. Among other things, the question of the severity of impact of administrative enforcement would require a different analysis. We of course express no opinion upon how that different question should be resolved if presented for necessary decision in another case.

**12.** Because we find the Contract Clause issue dispositive, we do not address the due process issue.