380 S.E.2d 183

**Bobby J. SHELL**

v.

**METROPOLITAN LIFE INSURANCE
CO., Frank T. Senkoski and John
W. Thomas.**

**No. CC986.**

Supreme Court of Appeals
of West Virginia.

April 6, 1989.

Ricklin Brown, Monica Kaminski, Bowles, McDavid, Graff & Love, Charleston, for Metropolitan Life Ins. and Frank T. Senkoski and John W. Thomas.

James M. Cagle, Charleston, for Bobby J. Shell.

MILLER, Justice:

The circuit court, having found constitutional the provisions of W.Va.Code, 33–12A–1, *et seq.* (1984), prohibiting an insurance company from discharging its agents except for "good cause" as defined in the statute, has certified this question to us. We find these provisions to be an unconstitutional impairment of existing contractual obligations under Article I, Section 10, Clause 1 of the United States Constitution[1] and Article III, Section 4 of the West Virginia Constitution.[2]

---

1. "No State shall ... pass any ... Law impairing the Obligation of Contracts...."

2. "No ... law impairing the obligation of a contract, shall be passed."

The material facts of this case are essentially undisputed. On or about September 30, 1968, Bobby J. Shell was hired by Metropolitan Life Insurance Company (Metropolitan) as an insurance agent. His employment contract provided that he could be dismissed by Metropolitan "without advance notice for breach of any of the conditions of your appointment and also at any time by two weeks' notice in writing[.]" [3]

In March, 1984, the Legislature enacted W.Va.Code, 33–12A–1, *et seq.*, governing contractual relationships between insurance companies and agents. W.Va.Code, 33–12A–3, provides:

"No insurance company may cancel, refuse to renew or otherwise terminate a written contractual relationship with any insurance agent who has been employed or appointed pursuant to that written contract by such insurance company for a period of more than five years, except for 'good cause,' as prescribed herein. If an insurance company proposes to cancel, fail to renew or otherwise terminate a contractual relationship with the agent, the company shall so notify the agent by certified mail at least ninety days prior to the date upon which the company proposed to cancel, fail to renew or terminate the contractual relationship. Such notice shall include a statement of the grounds upon which the insurance company bases its decision to cancel, refuse to renew or terminate any contractual relationship.

"The following matters are 'good cause' for an insurance company to terminate the contractual relationship with its agent:

"(a) Criminal misconduct or gross negligence relating to the business or premises of the insurance agency;

"(b) Fraud or moral turpitude;

"(c) Abandonment or unattendance of the business or premises of the insurance agency for such period of time as may unreasonably interfere with the transacting of business;

"(d) The failure by the agent to pay moneys over to the company for insurance contracts sold by the agency;

"(e) The death or disability of the agent; and

"(f) Upon the company becoming insolvent or discontinuing any line of insurance for any business purpose: Provided, That the insurance commissioner shall notify or cause to be notified in writing all agents of such insolvent insurance company that they are no longer entitled to any benefit under their contract with the insolvent company."

In March, 1985, some nine months after the effective date of the statute,[4] Metropolitan issued a new Manual of Instructions for Agents which, in essence, restated the "at will" nature of Mr. Shell's employment.[5]

On or about June 12, 1987, Mr. Shell was fired, ostensibly for unsatisfactory work performance, with two weeks' salary in lieu of notice. Mr. Shell subsequently filed suit against Metropolitan in the Circuit Court of Logan County, alleging that he had been wrongfully discharged from his employ-

---

**3.** Paragraph 5 of the agreement provides in full:

"Your appointment may be terminated by the Company without advance notice for breach of any of the conditions of your appointment and also at any time by two weeks' notice in writing given to you in person or by mailing such notice to your last address as shown on the records of the Company. Your agency with the Company may be terminated by you at any time, on not more than two weeks' notice in writing to the Company. Following termination of your agency, your commission account will be adjusted and the excess, if any, of credits over the debits, including any outstanding interim payments, will be payable as outlined in the applicable commission and compensation schedules as such

schedules may be issued, substituted or changed by the Company from time to time."

**4.** The statute took effect ninety days after the date of passage, March 8, 1984. *See* 1984 W.Va. Acts ch. 98.

**5.** Clause 16 of the manual provided, in pertinent part:

"A representative's appointment may be terminated by the Company without advance notice for breach of any of the conditions of his or her appointment and also at any time by two weeks' notice (or two weeks' compensation in lieu thereof) in writing given to him or her in person or by mailing such notice to his or her last address as shown on the records of the Company."

ment in violation of W.Va.Code, 33–12A–1, *et seq.*[6] In response to a motion for summary judgment, Metropolitan asserted that the statute unlawfully impaired the obligations of the parties under the employment contract and was, therefore, unconstitutional. Metropolitan sought summary judgment on this ground or, in the alternative, certification of the question to this Court. Mr. Shell subsequently joined in the motion to certify the question, and, by order dated July 12, 1988, the circuit court granted the motion.[7]

The principal issue before this Court is whether W.Va.Code, 33–12A–1, *et seq.*, violates the Contract Clauses of the state and federal constitutions. In construing our state constitutional provision prohibiting any "law impairing the obligation of a contract," W.Va. Const. art. III, § 4, we have generally accepted the United States Supreme Court's interpretation of the similar provision contained in Article I, Section 10, Clause 1 of the United States Constitution. *E.g., Dadisman v. Moore,* 181 W.Va. 779, 384 S.E.2d 816 (1988); *Orr v. County Comm'n of Cabell County,* 178 W.Va. 276, 359 S.E.2d 109 (1987); *Columbia Gas of West Virginia, Inc. v. Public Serv. Comm'n,* 173 W.Va. 19, 311 S.E.2d 137 (1983); *Wagoner v. Gainer,* 167 W.Va. 139, 279 S.E.2d 636 (1981); *Security Nat'l Bank & Trust Co. v. First W.Va. Bancorp, Inc.,* 166 W.Va. 775, 277 S.E.2d 613 (1981), *appeal dismissed,* 454 U.S. 1131, 102 S.Ct. 986, 71 L.Ed.2d 284 (1982); *Preston County Light & Power Co. v. Renick,* 145 W.Va. 115, 113 S.E.2d 378 (1960).

Initially, Mr. Shell contends that the Contract Clause analysis has no application here because his employment contract was modified by the new agents' manual issued in March, 1985. Mr. Shell argues that he was, in essence, given a new employment contract after the effective date of W.Va. Code, 33–12A–1, *et seq.*, and that the statute therefore impairs no preexisting obligations.

In Syllabus Point 1, in part, of *Devon Corp. v. Miller,* 167 W.Va. 362, 280 S.E.2d 108 (1981), *cert. denied,* 455 U.S. 993, 102 S.Ct. 1622, 71 L.Ed.2d 855 (1982), we recognized the general rule that the constitutional prohibitions against impairment of contractual obligations are not ap-

---

**6.** Mr. Shell also alleged that his discharge violated the age discrimination provisions of the West Virginia Human Rights Act, W.Va.Code, 5–11–1, *et seq.* That cause of action is not involved in these proceedings and is not affected by our decision in this case.

**7.** As required by Rule 3(b) of the Rules of Appellate Procedure and W.Va.Code, 58–5–2, the circuit court certified to this Court the following questions, along with its rulings thereon:

"1. Does West Virginia Code § 33–12A–1, *et seq.,* and specifically § 33–12A–3 constitute a substantial impairment of the obligation of contracts in violation of Art. I, § 10 of the United States Constitution and Art. III, § 4 of the Constitution of the State of West Virginia? *Ruling:* The Court finds that § 33–12A–1, *et seq.,* and specifically § 33–12A–3, do not constitute any unconstitutional impairment of contracts.

"2. Did the State of West Virginia have a significant and legitimate public purpose for enacting West Virginia Code § 33–12A–1, *et seq.,* and specifically § 33–12A–3? *Ruling:* The Court finds that the West Virginia Legislature had a legitimate public purpose for enacting § 33–12A–1, *et seq.,* as expressed in the legislature's 'Declaration of Purpose' section therein.

"3. Does the passage of West Virginia Code § 33–12A–1, *et seq.,* and specifically § 33–12A–3, constitute a valid exercise of this state's police powers? *Ruling:* The Court finds that the legislative branch's enactment of § 33–12A–1, *et seq.,* and specifically § 33–12A–[3], was a valid exercise of the police powers of the State of West Virginia.

"4. Does West Virginia Code § 33–12A–1, *et seq.,* and specifically § 33–12A–3, provide a private cause of action for termination of a preexisting contract by one of the parties thereto, in violation of the express terms of that contractual agreement? *Ruling:* The Court finds that while § 33–12A–1, *et seq.,* and specifically § 33–12A–3, may provide a private cause of action to an insurance agent which thereby necessitates termination of a preexisting contract between these parties; because it is a valid exercise of this State's police power, it is, therefore, permissible.

"5. Is West Virginia Code § 33–12A–1, *et seq.,* and specifically § 33–12A–3, constitutional? *Ruling:* The Court finds that § 33–12A–1, *et seq.,* and specifically § 33–12A–3, are constitutional for the above stated reasons."

plicable to contracts formed after the effective date of the statute:

> "The clauses of the Constitution of the United States and the Constitution of West Virginia which forbid the passage of a law impairing the obligation of a contract are not applicable to a statute enacted prior to the making of a contract."

This rule was drawn from *Edgar A. Levy Leasing Co. v. Siegel*, 258 U.S. 242, 42 S.Ct. 289, 66 L.Ed. 595 (1922), and *Oshkosh Waterworks Co. v. City of Oshkosh*, 187 U.S. 437, 23 S.Ct. 234, 47 L.Ed. 249 (1903), but is supported in a number of other cases. *E.g., Watson v. Employers Liability Assurance Co.*, 348 U.S. 66, 75 S.Ct. 166, 99 L.Ed. 74 (1954); *Munday v. Wisconsin Trust Co.*, 252 U.S. 499, 40 S.Ct. 365, 64 L.Ed. 684 (1920). The rationale for this rule is apparent: There can be no impairment of contractual obligations which did not exist at the time the challenged statute was enacted. Thus, the Contract Clause prohibits only those statutes which impair existing contracts.

■ We must agree with Metropolitan, however, that Mr. Shell's employment contract predated the enactment of W.Va. Code, 33–12A–1, *et seq.* Nothing in the March, 1985 amendments to the agents' manual modified the provisions of the 1968 contract concerning the "at will" nature of Mr. Shell's employment. In fact, the new agents' manual expressly acknowledged Metropolitan's right to terminate Mr. Shell's employment for any reason on proper notice. We cannot conclude that Metropolitan, in essence, executed a new contract with Mr. Shell after the passage of W.Va. Code, 33–12A–1, *et seq.* Accordingly, we turn to the issue of whether the statute unconstitutionally impaired the parties' preexisting contractual rights.

■ In *Orr v. County Comm'n of Cabell County*, 178 W.Va. at 278, 359 S.E.2d at 111, we quoted with approval the following language from *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 410, 103 S.Ct. 697, 704, 74 L.Ed.2d 569, 580 (1983):

> "Although the language of the Contract Clause is facially absolute, its prohibition must be accommodated to the inherent police power of the State 'to safeguard the vital interests of its people.' *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 434, 54 S.Ct. 231, 239, 78 L.Ed. 413 [426] (1934)."

We expressed a similar thought in *Security Nat'l Bank & Trust Co.*, 166 W.Va. at 780, 277 S.E.2d at 616, where we said that "[s]tates can preserve community order, health, safety, morals and economic well-being, even though contracts are affected."

On the other hand, the Supreme Court has also noted "the high value the Framers placed on the protection of private contracts," and held that "[i]f the Contract Clause is to retain any meaning at all, ... it must be understood to impose *some* limits upon the power of a State to abridge existing contractual relationships, even in the exercise of its otherwise legitimate police power." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 245, 242, 98 S.Ct. 2716, 2723, 2721, 57 L.Ed.2d 727, 737, 734 (1978). (Emphasis in original). Thus, the application of the Contract Clause generally involves a balancing of competing public and private interests.

■ In *Energy Reserves Group, Inc. v. Kansas Power & Light Co., supra,* the Supreme Court enunciated a three-step test for balancing these interests. As we recognized in *Security Nat'l Bank & Trust Co.*, 166 W.Va. at 780, 277 S.E.2d at 616, the initial inquiry is whether the statute has substantially impaired the contractual rights of the parties. *Energy Reserves Group*, 459 U.S. at 411, 103 S.Ct. at 704, 74 L.Ed.2d at 580. *See Allied Structural Steel Co. v. Spannaus, supra; United States Trust Co. v. New Jersey*, 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977). If a substantial impairment is shown, the second step of the test is to determine whether there is "a significant and legitimate public purpose behind the regulation, *United States Trust Co.*, 431 U.S., at 22, [52 L.Ed.2d at 109] 97 S.Ct., at 1517, such as the remedying of a broad and general social or economic problem. *Allied Struc-*

*tural Steel Co.*, 438 U.S., at 247, 249, [57 L.Ed.2d at 738–39] 98 S.Ct. at 2723–2725." *Energy Reserves Group*, 459 U.S. at 411–12, 103 S.Ct. at 704–05, 74 L.Ed.2d at 581. Finally, if a legitimate public purpose is demonstrated, the court must determine "whether the adjustment of 'the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption.' *United States Trust Co.*, 431 U.S., at 22, [52 L.Ed.2d at 109–10] 97 S.Ct., at 1518." *Energy Reserves Group*, 459 U.S. at 412, 103 S.Ct. at 705, 74 L.Ed.2d at 581. (Text brackets in original).

■ Our initial inquiry, therefore, is whether W.Va.Code, 33–12A–1, *et seq.*, impairs the existing contractual obligations of the parties. In *Allied Structural Steel Co.*, 438 U.S. at 245, 98 S.Ct. at 2722–23, 57 L.Ed.2d at 736–37 the Supreme Court stated:

> "The severity of the impairment measures the height of the hurdle the state legislation must clear. Minimal alteration of contractual obligations may end the inquiry at its first stage. Severe impairment, on the other hand, will push the inquiry to a careful examination of the nature and purpose of the state legislation." (Footnote omitted).

In *Energy Reserves Group*, 459 U.S. at 411, 103 S.Ct. at 704, 74 L.Ed.2d at 580, the Court further noted:

> "Total destruction of contractual expectations is not necessary for a finding of substantial impairment. *United States Trust Co.*, 431 U.S., at 26–27, [52 L.Ed.2d at 112–13] 97 S.Ct., at 1519–1520. On the other hand, state regulation that re-

stricts a party to gains it reasonably expected from the contract does not necessarily constitute a substantial impairment. *Id.*, at 31, [52 L.Ed.2d at 115] 97 S.Ct., at 1522, citing *El Paso v. Simmons*, 379 U.S. 497, 515, 85 S.Ct. 577, 587, 13 L.Ed.2d 446 (1965)."

Under the employment contract here, Metropolitan had the unilateral right to discharge agents at will upon two weeks' notice. Clearly, by requiring insurance companies to show "good cause" for the dismissal of agents, W.Va.Code, 33–12A–3, severely limits the circumstances in which Metropolitan could discharge employees.

Moreover, W.Va.Code, 33–12A–5, provides the agent with a private cause of action for termination of his employment or nonrenewal of his contract for other than the "good cause" specified in the statute.[8] This places an additional burden on Metropolitan that did not exist in the employment contract[9] and subjects Metropolitan to the prospect of costly and disruptive legal challenges even where dismissal is proper under the statute. The statutory imposition of these additional burdens appears to us to constitute a substantial impairment of the parties' existing contractual obligations. *See Ward v. Chevron U.S.A. Inc.*, 123 Ariz. 208, 598 P.2d 1027 (1979); *Union Oil Co. v. Moesch*, 88 Cal.App.3d 72, 151 Cal.Rptr. 517 (1979); *Globe Liquor Co. v. Four Roses Distillers Co.*, 281 A.2d 19 (Del.Super.), *cert. denied*, 404 U.S. 873, 92 S.Ct. 103, 30 L.Ed.2d 117 (1971).

■ Mr. Shell, however, argues that the impairment is minimal in view of the considerable regulation of the insurance industry in this state. W.Va.Code, 33–1–1, *et*

---

**8.** W.Va.Code, 33–12A–5, provides:

"If any insurance company cancels, refuses to renew or otherwise terminates the contractual relationship with any agent in violation of the provisions of this article, the agent who has been damaged thereby has a cause of action against the insurance company for specific performance, injunctive relief or for damages sustained by the plaintiff as a result of the termination of the relationship, including ascertainable loss of goodwill as a result of the termination of the relationship: Provided, That any action brought by an insurance

agent against an insurance company for wrongful termination of the contractual relationship shall be commenced within two years after such wrongful termination."

**9.** We, along with other courts, have recognized that there are certain constraints to firing an at-will employee. Such firing may give rise to a suit for damages "where the employer's motivation for the discharge is to contravene some substantial public policy principal [*sic*]." Syllabus, in part, *Harless v. First Nat'l Bank*, 162 W.Va. 116, 246 S.E.2d 270 (1978).

*seq.* It is recognized that one of the factors to be considered in determining the degree of impairment is whether the industry the statute seeks to regulate has been regulated in the past. *Energy Reserves Group, Inc. v. Kansas Power & Light Co., supra; Allied Structural Steel Co. v. Spannaus, supra; Veix v. Sixth Ward Bldg. & Loan Ass'n,* 310 U.S. 32, 84 L.Ed. 1061, 60 S.Ct. 792 (1940); *Security Nat'l Bank & Trust Co. v. First W.Va. Bancorp, Inc., supra.* As we stated in note 4 of *Columbia Gas of West Virginia, Inc. v. Public Serv. Comm'n:* "In areas where there is regulation and the possibility of future regulation exists, state action affecting private contracts is less likely to be found violative of the contracts clause." 173 W.Va. at 25, 311 S.E.2d at 143, *citing Allied Structural Steel Co. v. Spannaus, supra* and *Veix v. Sixth Ward Bldg. & Loan Ass'n, supra.*

■ This is not to say, however, that prior regulation of an industry as a whole necessarily precludes every claim that subsequent legislation unconstitutionally impairs preexisting contractual obligations. In *Veix v. Sixth Ward Bldg. & Loan Ass'n, supra,* the Supreme Court considered the effect of amendments to a New Jersey statute altering the terms upon which a shareholder in a building and loan association could withdraw his shares. In concluding that the amendments did not unconstitutionally impair the contractual obligations of the plaintiff, who had purchased his shares when the prior statute was in effect, the Supreme Court held: "When he purchased into an enterprise already regulated *in the particular to which he now objects,* he purchased subject to further legislation *upon the same topic.*" 310 U.S. at 38, 60 S.Ct. at 795, 84 L.Ed. at 1065. (Footnote omitted; emphasis added).

This language was quoted in *Energy Reserves Group,* 459 U.S. at 411, 103 S.Ct. at 704, 74 L.Ed.2d at 580, and cited with approval in note 13 of *Allied Structural Steel Co.,* 438 U.S. at 242–43, 98 S.Ct. at 2721, 57 L.Ed.2d at 735. In *Allied Structural Steel Co.,* the Supreme Court applied the Contract Clause to a Minnesota statute requiring private employers who had established employee pension plans to pay a "pension funding charge" upon ceasing business activity within the state. The Court concluded that the statute unconstitutionally impaired the preexisting contractual obligations of such employers. It relied, in part, on the fact that the subject of the legislation had not been previously regulated, thereby "imposing a sudden, totally unanticipated, and substantial retroactive obligation upon" employers who had established employee pension plans prior to the statute's effective date. 438 U.S. at 249–50, 98 S.Ct. at 2725, 57 L.Ed.2d at 739.

The clear import of these cases is that an impairment of contract may not be found if the prior regulation of an industry is related to the subject of the contract so as to put the parties on notice of the possibility of future regulation on the same subject. The question of how the prior regulation relates to the challenged legislation is often not easily answered. One court has stated: "[P]rior regulation must share more in common with the challenged legislation than merely the industry in which it operates to bar a subsequent finding of substantial impairment." *Ross v. City of Berkeley,* 655 F.Supp. 820, 831 (N.D.Cal. 1987). Accordingly, we "must look to the *nature* as well as the act of regulation" to determine whether prior regulation of the industry preempts the Contract Clause claim. 655 F.Supp. at 830. (Emphasis added).

In *Garris v. Hanover Ins. Co.,* 630 F.2d 1001 (4th Cir.1980), the Fourth Circuit Court of Appeals struck down, as violative of the Contract Clause, a South Carolina statute which barred an insurance company from discharging an agent based on the amount of assigned risk insurance he wrote. While recognizing that the insurance industry was substantially regulated in South Carolina, the court concluded:

"But while it is indisputable that in South Carolina, as elsewhere, the insurance industry has traditionally been subjected to state regulation, there is no indication that the particular contractual relationship here involved has, as such,

even been caught up in the general scheme of regulation." 630 F.2d at 1007. *See also G–H Ins. Agency, Inc. v. Continental Ins. Co.,* 278 S.C. 241, 294 S.E.2d 336 (1982).

We view the *Garris* case, with its focus on the particular contract subject, as an appropriate resolution of the regulated industry issue here. Although Chapter 33 of our Code imposes considerable regulation on the sale of insurance in this state, prior to the enactment of W.Va.Code, 33–12A–1, *et seq.,* there was never any attempt to regulate the insurer's right to hire and fire insurance agents. Accordingly, it can hardly be said that the parties here could reasonably have foreseen the creation of a "good cause" prerequisite to termination of that relationship and a private cause of action for wrongful termination at the time the contract was executed.

Mr. Shell argues that a broader reading of the Contract Clause is required under *Energy Reserves Group, Inc. v. Kansas Power & Light Co., supra,* a case involving state regulation of the wellhead price of natural gas. In concluding that the state statute did not violate the Contract Clause, the Supreme Court noted: "At the time of the execution of these contracts, Kansas did not regulate natural gas prices specifically, *but its supervision of the industry was extensive and intrusive.*" 459 U.S. at 413–14, 103 S.Ct. at 706, 74 L.Ed.2d at 582. (Footnotes omitted; emphasis added).

We note, however, that in *Energy Reserves Group,* the Supreme Court recognized that natural gas was subject to federal price regulation at the time [10] and acknowledged, in note 17, that Kansas had regulated the wellhead price of natural gas in the past. 459 U.S. at 413–14, 103 S.Ct. at 706, 74 L.Ed.2d at 582. Moreover, the decision in *Energy Reserves Group, Inc. v. Kansas Power & Light Co., supra,* did not turn on the effect of prior regulation of the industry, but, rather, on the fact that the contract between the parties itself anticipated future state regulation of gas prices.[11] Accordingly, "ERG's reasonable expectations have not been impaired by the Kansas Act. See *El Paso v. Simmons,* 379 U.S., at 515, 85 S.Ct. at 587, [13 L.Ed.2d at 458]." 459 U.S. at 416, 103 S.Ct. at 707, 74 L.Ed.2d at 584. Finally, we note that in Contract Clause cases after *Energy Reserves Group,* the Supreme Court appears to have put little emphasis on prior industry regulation.[12]

Since we find nothing in the United States Supreme Court opinions that demands a contrary result, we conclude that the involved legislation does substantially impair contractual obligations with respect to those contracts of over five years' dura-

**10.** "Moreover, under the authority of § 5(a) of the 1938 Natural Gas Act, the Federal Power Commission (FPC) set 'just and reasonable' rates for prices of gas both at the wellhead and in the pipelines." 459 U.S. at 414, 103 S.Ct. at 706, 74 L.Ed.2d at 582.

**11.** The Supreme Court, in *Energy Reserves Group,* 459 U.S. at 416, 103 S.Ct. at 707, 74 L.Ed.2d at 583–84, stated:

"Moreover, the contracts expressly recognize the existence of extensive regulation by providing that any contractual terms are subject to relevant present and future state and federal law. This latter provision could be interpreted to incorporate all future state price regulation, and thus dispose of the Contract Clause claim. Regardless of whether this interpretation is correct, the provision does suggest that ERG knew its contractual rights were subject to alteration by state price regulation." (Footnotes omitted).

**12.** In *Exxon Corp. v. Eagerton,* 462 U.S. 176, 103 S.Ct. 2296, 76 L.Ed.2d 497 (1983), the Supreme

Court held that statutory restrictions on the ability of oil and gas producers to pass tax increases on to consumers had only an incidental effect on existing contractual obligations. However, the Supreme Court mentioned the regulated nature of the industry only in passing in note 14: "Our conclusion is buttressed by the fact that appellants operate in industries that have been subject to heavy regulation." 462 U.S. at 194, 103 S.Ct. at 2307, 76 L.Ed.2d at 512. In *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987), the Court, in rejecting a Contract Clause attack on a Pennsylvania statute which, in effect, voided the waiver of subjacent support in coal severance deeds, did not even mention the fact that the coal industry was substantially regulated. After acknowledging without discussion that a substantial impairment existed, the Court concluded that public environmental considerations sustained the regulation.

tion [13] because it alters the "at will" nature of the employment relationship. *See Morgan v. Kemper Ins. Companies,* 754 F.2d 145 (4th Cir.1985); *Jacobsen v. Anheuser–Busch, Inc.,* 392 N.W.2d 868 (Minn.1986), *cert. denied,* 479 U.S. 1060, 107 S.Ct. 941, 93 L.Ed.2d 991 (1987); *Smith Ins., Inc. v. Grievance Committee,* 120 N.H. 856, 424 A.2d 816 (1980); *G–H Ins. Agency, Inc. v. Continental Ins. Co., supra.*

Having determined that a substantial impairment exists, we must now consider whether the legislation is justified by a significant and legitimate public purpose. This requirement "guarantees that the State is exercising its police power, rather than providing a benefit to special interests." *Energy Reserves Group,* 459 U.S. at 412, 103 S.Ct. at 705, 74 L.Ed.2d at 581. (Footnote omitted). *See Security Nat'l Bank & Trust Co. v. First W.Va. Bancorp, Inc., supra.*

It seems clear that the primary purpose of this statute is to benefit insurance agents. Although the legislative declaration of purpose contained in W.Va.Code, 33–12A–1, states that the legislation "is essential to the best interests of the citizens," the true purpose is clearly designated as "prohibiting arbitrary and capricious cancellation of . . . contractual relationships." [14]

We may agree that the State can have a legitimate interest in adjusting the contract rights of the parties so that insurance agents cannot be arbitrarily or capriciously fired by insurance companies. *See Harless v. First Nat'l Bank,* 162 W.Va. 116, 246 S.E.2d 270 (1978). However, W.Va.Code, 33–12A–1, *et seq.,* is hardly intended to remedy "a broad and general social or economic problem" in that regard. *Energy*

*Reserves Group,* 459 U.S. at 412, 103 S.Ct. at 704–05, 74 L.Ed.2d at 581; *Allied Structural Steel Co.,* 438 U.S. at 247, 249, 98 S.Ct. at 2723–25, 57 L.Ed.2d at 738–39. As developed more fully, *infra,* this legislation is designed to protect a narrow class of citizens, i.e., insurance agents, rather than a broad societal interest. It is not imbued with the substantial public policy that will justify state interference with the private contractual obligations of these parties.

Mr. Shell argues that the statute also benefits the general public by ensuring a pool of experienced agents. Initially, it would seem that from a practical business standpoint, if an agent is doing a good job, he will not be fired. Consequently, the pool of capable and experienced agents would not be drained.

Even if we were to conclude that Mr. Shell has asserted a legitimate public purpose justifying the impairment of the parties' preexisting contractual rights, we question whether W.Va.Code, 33–12A–1, *et seq.,* strikes an appropriate balance between the reasonable exercise of the State's police power and legislation that simply benefits a special interest group.

The statutory scheme suggests simply that a benefit is conferred on special interests. It permits dismissal of an insurance agent only upon the most egregious grounds: (1) criminal misconduct or gross negligence relating to the business, (2) fraud or moral turpitude, (3) abandonment of the business, (4) failure to pay moneys owned to the company, (5) death or disability of agent, or (6) insolvency of the company or discontinuance of a line of insurance. W.Va.Code, 33–12A–3. However, these grounds bear no relationship to W.Va.Code, 33–12–25, which authorizes the State to

---

**13.** An agent must have been employed pursuant to a written contract "for a period of more than five years" before he is entitled to invoke the "good cause" provisions of W.Va.Code, 33–12A–3. The parties appear to concede that the cause of action provision in W.Va.Code, 33–12A–5, applies only to agents who have been employed more than five years. This section speaks of termination or refusal to renew a contract "in violation of the provisions of this article." *See* note 8, *supra,* for the full text of W.Va.Code, 33–12A–5.

**14.** The full text of W.Va.Code, 33–12A–1, is:

"It is hereby found and determined by the legislature that it is essential to the best interests of the citizens of this State that the contractual relationship between insurance agents and insurance companies be established; and that this article is enacted for the purpose of prohibiting arbitrary and capricious cancellation of such contractual relationships."

revoke or suspend an insurance agent's license on the ground that he "has violated any provision of this chapter, or is incompetent or untrustworthy." [15]

Clearly, the narrow parameters of W.Va. Code, 33–12A–1, *et seq.*, protect an incompetent agent from dismissal in many situations and give rise to the prospect of an insurance company being forced to retain an agent whose license has been revoked or suspended, because there is not "good cause" for discharging him under the statute. This cannot be construed to be for the general good of the public.

Finally, even where "good cause" for dismissal exists under the statute, the agent may avoid dismissal under W.Va. Code, 33–12A–4,[16] by rectifying or eliminating the grounds for discharge before the termination date.[17] This benefits solely the agent and enables even an agent who is guilty of outrageous misconduct to keep his job. Such a provision can hardly be deemed to benefit the general public who may deal with such agents.

As we have seen, the specific language of this legislation goes far beyond the modest public purpose asserted by Mr. Shell. W.Va.Code, 33–12A–1, *et seq.*, does not only protect insurance agents from arbitrary dismissal. It also protects the incompetent agent, enables a "good cause" ground for dismissal to be cured and there-

by defeated, and shields from termination even an agent whose license has been suspended or revoked. Clearly, the scope of the legislation substantially exceeds the public purpose asserted by Mr. Shell as justifying its impairment of the contractual obligations of the parties.[18]

From the foregoing, we conclude that W.Va.Code, 33–12A–1 *et seq.*, precludes insurance agents from being discharged except for good cause and confers a private cause of action upon agents dismissed on other grounds. To the extent this statute affects existing rights under employment contracts executed before its effective date, it violates the Contract Clauses of the state and federal constitutions.[19]

■ We need not answer the remaining certified questions. In *City of Fairmont v. Retail, Wholesale, and Dept. Store Union, AFL–CIO,* 166 W.Va. 1, 3–4, 283 S.E.2d 589, 590–91 (1980), we stated: "We have traditionally maintained that upon receiving certified questions we retain some flexibility in determining how and to what extent they will be answered. *West Virginia Water Serv. Co. v. Cunningham,* 143 W.Va. 1, 98 S.E.2d 891 (1957)." In Syllabus Point 6 of *Cunningham,* the Court stated:

> "In a certified case, this Court will not consider certified questions not necessary to a decision of the case."

---

**15.** The complete text of W.Va.Code, 33–12–25, is:

> "Whenever, after notice and hearing, the commissioner is satisfied that any agent, solicitor, broker or excess line broker has violated any provision of this chapter, or is incompetent or untrustworthy, he shall revoke, suspend, or, if renewal of license is pending, refuse to renew the license of such agent, solicitor, broker or excess line broker. In lieu of revoking, suspending or refusing to renew such license, the commissioner may in his discretion order such licensee to pay to the State of West Virginia a penalty in a sum not to exceed one hundred dollars and upon the failure of such licensee to pay such penalty by delivery of such sum to the commissioner within thirty days of notice thereof, the commissioner shall revoke, suspend or refuse to renew such license."

**16.** W.Va.Code, 33–12A–4, provides:

> "If, upon receipt by the insurance agent of the notice of proposed cancellation provided

by the preceding section, the insurance agent prior to the established cancellation date as stated in the notice rectifies or eliminates the state ground constituting 'good cause' for cancellation of the contract, the notice shall be void."

**17.** Under W.Va.Code, 33–12A–3, the agent is entitled to notice of the cancellation of his contract at least ninety days before termination of his employment.

**18.** As we have earlier indicated, it is possible for the legislature to enact a more narrowly drawn statute, which might give some protection against the arbitrary and capricious firing of insurance agents.

**19.** We emphasize again that under Syllabus Point 1 of *Devon Corp. v. Miller, supra,* W.Va. Code, 33–12A–1, *et seq.*, is not unconstitutional as to insurance employment contracts entered into after the effective date of this Act.

As the remainder of the certified questions formulated by the circuit court are either redundant or unnecessary to the decision in this case, we decline to address them. *See Lee v. Saliga,* 179 W.Va. 762, 373 S.E.2d 345 (1988); *Gardner v. Norfolk and Western Ry. Co.,* 179 W.Va. 724, 372 S.E.2d 786 (1988); *Deeds v. Lindsey,* 179 W.Va. 674, 371 S.E.2d 602 (1988); *Sitzes v. Anchor Motor Freight, Inc.,* 169 W.Va. 698, 289 S.E.2d 679 (1982).

For the reasons stated herein, we conclude that W.Va.Code, 33–12A–1, *et seq.,* unlawfully impairs the obligations of the parties to this action under the 1968 employment contract and is, therefore, unconstitutional in its application. The circuit court's rulings on the certified questions are, therefore, reversed to the extent they are inconsistent with this opinion, and the case is remanded to the Circuit Court of Logan County for such further proceedings as may be necessary.

Certified Questions Answered; Case Remanded.